S09P1428. HUMPHREYS v. THE STATE.
(694 SE2d 316)

NAHMIAS, Justice.

A jury convicted Stacey Ian Humphreys of two counts of murder and related offenses. After finding beyond a reasonable doubt multiple statutory aggravating circumstances, the jury recommended death sentences for the murder convictions, and the trial court entered judgment accordingly. See OCGA §§ 17-10-30, 17-10-31 (a). Humphreys's motion for new trial was denied, and he appeals his convictions and sentences.[1] For the reasons set forth below, we affirm.

*Sufficiency of the Evidence*

1. The evidence, construed in the light most favorable to the jury's verdicts, showed the following. At approximately 12:40 p.m. on November 3, 2003, Humphreys, a convicted felon who was still on parole, entered a home construction company's sales office located in a model home for a new subdivision in Cobb County. Cindy Williams

---

[1] The crimes occurred on November 3, 2003. On February 12, 2004, a Cobb County grand jury indicted Humphreys on two counts each of malice murder, felony murder, aggravated assault, kidnapping with bodily injury, and armed robbery, and one count of possession of a firearm by a convicted felon. On the same date, the State filed written notice of its intent to seek the death penalty. Jury selection began on September 4, 2007. On September 26, 2007, Humphreys pleaded guilty to possession of a firearm by a convicted felon, following his convictions by the jury on all other counts of the indictment the previous day. The jury recommended death sentences for the malice murder convictions on September 30, 2007. The trial court imposed death sentences for the murders, and the felony murder convictions were vacated by operation of law. *Malcolm v. State,* 263 Ga. 369, 371-372 (4) (434 SE2d 479) (1993). The trial court also imposed a consecutive life sentence for each count of kidnapping with bodily injury and armed robbery, concurrent 20-year sentences for each count of aggravated assault, and a concurrent five-year sentence for possession of a firearm by a convicted felon. Humphreys filed a motion for new trial on October 10, 2007, which he amended on October 1, 2008, and which the trial court denied on February 19, 2009. Humphreys filed a notice of appeal on March 20, 2009, which he amended on March 23, 2009. The appeal was docketed in this Court on May 7, 2009, and was orally argued on September 21, 2009.

and Lori Brown were employed there as real estate agents. Finding Ms. Williams alone in the office, Humphreys used a stolen handgun to force her to undress and to reveal the personal identification number (PIN) for her automated teller machine (ATM) card. After calling Ms. Williams's bank to learn the amount of her current balance, Humphreys tied her underwear so tightly around her neck that, when her body was discovered, her neck bore a prominent ligature mark and her tongue was protruding from her mouth, which had turned purple. While choking Ms. Williams, Humphreys forced her to get down on her hands and knees and to move into Ms. Brown's office and behind Ms. Brown's desk. Humphreys placed his handgun at Ms. Williams back and positioned a bag of balloons between the gun and her body to muffle the sound of gunshots. He then fired a shot into her back that went through her lung and heart, fired a second shot through her head, and left her face-down on her hands and knees under the desk.

Ms. Brown entered the office during or shortly after Humphreys's attack on Ms. Williams, and he attacked her too. Ms. Brown suffered a hemorrhage in her throat that was consistent with her having been choked in a headlock-type grip or having been struck in the throat. Humphreys also forced Ms. Brown to undress and to reveal her PIN, called her bank to obtain her balance, and made her kneel with her head facing the floor. Then, while standing over Ms. Brown, Humphreys fired one gunshot through her head, this time using both a bag of balloons and Ms. Brown's folded blouse to muffle the sound. He dragged her body to her desk, took both victims' driver's licenses and ATM and credit cards, and left the scene at approximately 1:30 p.m. Neither victim sustained any defensive wounds.

When the builder, whose office was located in the model home's basement, heard the door chime of the security system indicating that someone had exited the sales office, he went to the sales office to meet with the agents. There he discovered Ms. Brown's body and called 911. The responding police officer discovered Ms. Williams's body.

After interviewing the builder and canvassing the neighborhood, the police released to the media descriptions of the suspect and a Dodge Durango truck seen at the sales office near the time of the crimes. In response, someone at the job site where Humphreys worked called to advise that Humphreys and his vehicle matched those descriptions and that Humphreys did not report to work on the day of the crimes. The police began to investigate Humphreys and made arrangements through his parole officer to meet with him on the morning of November 7, 2003. Humphreys skipped the meeting, however, and eluded police officers who had him under surveillance.

Humphreys was apprehended in Wisconsin the following day.

Police there recovered from the console of his rental vehicle a Ruger 9-millimeter pistol, which was determined to be the murder weapon. Swabbings from that gun revealed blood containing Ms. Williams's DNA. A stain on the driver-side floormat of Humphreys's Durango was determined to be blood containing Ms. Brown's DNA.

After the murders, the victims' ATM cards were used to withdraw over $3,000 from their accounts. Two days after the murders, Humphreys deposited $1,000 into his account, and he had approximately $800 in cash in his possession when he was arrested. Humphreys claimed in a statement to the police that he did not remember his actions at the time of the crimes. However, when asked why he fled, he said: "I know I did it. I know it just as well as I know my own name." He also told the police that he had recently taken out some high-interest "payday" loans and that he "got over [his] head with that stinking truck."

The evidence presented at trial and summarized above was easily sufficient for a rational jury to find Humphreys guilty beyond a reasonable doubt of the crimes charged. *Jackson v. Virginia*, 443 U. S. 307, 319 (III) (B) (99 SC 2781, 61 LE2d 560) (1979).

### Pre-Trial Issues

2. Humphreys asserts that the trial court erred in failing to quash the indictment against him because the jury administrator improperly and arbitrarily excused potential grand jurors, thus vitiating the array.[2]

(a) *The jury administrator's authority.* Humphreys contends that the jury administrator was without authority to grant excusals and deferments, because the 1984 standing order adopted by the Cobb County Superior Court authorizing her to do so was repealed by the adoption of the Uniform Rules of Superior Courts and was never re-adopted. Humphreys asserts that the Uniform Rules were adopted in 1994. In fact, the Uniform Rules were originally adopted by order of this Court in accordance with the directive of Art. VI, Sec. IX, Par. I, of the 1983 Constitution of the State of Georgia and became effective on July 1, 1985. See 253 Ga. 800, 800 (1985).

While Rule 1.1 of the original Uniform Rules provided that "[a]ll

---

[2] In its order denying Humphreys's motion for new trial, the trial court cited this Court's denial of the petition for interim review in this case, see OCGA § 17-10-35.1; U.A.P. II (F)-(H), as the basis for denying this claim, as well as some of Humphreys's other claims. We remind trial courts and parties in death penalty cases that the failure of this Court to grant interim review of any question that could be raised under the interim review procedure does not constitute an adjudication of that question. See OCGA § 17-10-35.1 (h); U.A.P. II (H) (5). See also *Harper v. State*, 283 Ga. 102, 107 (3) (657 SE2d 213) (2008) (declining to address on interim review an issue not set forth in this Court's order granting review and noting that the failure to do so did not " 'waive the right to posttrial review' ").

local rules of superior courts in effect as of the effective date of these rules are hereby repealed[,]" Rule 1.2 provided that, "[t]he above provisions notwithstanding, each superior court may retain or adopt without specific Supreme Court approval . . . an order establishing guidelines governing excuses from jury duty pursuant to OCGA § 15-12-1.0 [sic]."[3] OCGA § 15-12-1 (a) (1) provides in relevant part that any person who shows "good cause why he or she should be exempt from jury duty may be excused by . . . [a] person who has been duly appointed by order of the chief judge to excuse jurors" where "guidelines governing excuses" have been established by court order. The Code section further provides for the excusal or deferment of specifically described persons. See OCGA § 15-12-1 (a) (2) through (c) (2).

Among the evidence presented at the pre-trial hearing were two orders signed by the chief judge of the Cobb County Superior Court. The first order, which was entered in April of 1984, "appointed and empowered" the court administrator and the deputy court administrator/jury manager "to receive requests for jury deferments and make determinations as to deferments and excusals" in accordance with guidelines contained within the order. While the order does not cite OCGA § 15-12-1, it tracks that statute's language. The second order, which was entered after the original adoption of the Uniform Rules "[p]ursuant to Rule 1.2," provides for the retention of "the local court rules establishing guidelines governing excuses from jury duty pursuant to OCGA 15-12-1.0." That order became effective on July 1, 1985.

In 1994, Rule 1.1 was amended to provide that "[a]ll local rules of the superior courts," except those relating to jury pool selection, would expire effective December 31, 1994. However, Rule 1.2 continued to provide that "[t]he above provisions notwithstanding, each superior court may retain" without specific approval of this Court "an order establishing guidelines governing excuses from jury duty." See Rule 1.2 (D).[4] There is no evidence that the Cobb County Superior Court did not retain its 1984 and 1985 juror excusal and deferment orders, and indeed we are aware of no authority for the proposition that such orders automatically become invalid when the Uniform Rules are amended. See *English v. State*, 290 Ga. App. 378,

---

[3] The citation should have read simply "OCGA § 15-12-1," as there was no subsection "1.0."

[4] Apparently when the Uniform Rules were amended in 1994, the decimal point was omitted from the citation to OCGA § "15-12-1.0" in Rule 1.2 (D). That was clearly a typographical error, as the remainder of Rule 1.2 (D) remains the same as that portion of the original Rule 1.2 and OCGA § 15-12-10 concerns delinquent jurors and is obviously inapplicable.

382 (3) (a) (659 SE2d 783) (2008) (noting lack of authority for the proposition "that such an order becomes invalid when the chief judge who signed it retires"). We therefore reject Humphreys's contention that the jury administrator was without authority to excuse or defer potential grand jurors for his case.

(b) *The jury administrator's grounds for excusals.* We also do not find reversible error in the manner in which potential grand jurors were excused from service. At the pre-trial hearing, the jury administrator testified that she summoned 65 potential grand jurors for the term of court during which Humphreys was indicted, that seven of those potential jurors were excused, and that two potential jurors were deferred. A review of the testimony and evidence presented at the hearing shows that the jury administrator investigated the juror excusals and deferments and that they were authorized under the guidelines in the 1984 standing order, under statutory provisions, or under both. While the jury administrator did not obtain a notarized affidavit in every situation, she did obtain written confirmation in each case. Under our precedent, there clearly was not "such disregard of the essential and substantial provisions of the statute as would vitiate the array[ ]." *Franklin v. State*, 245 Ga. 141, 145-147 (1) (263 SE2d 666) (1980) (finding no reversible error where court administrator and his secretary excused potential grand jurors for statutory and hardship reasons based on telephone calls without conducting investigations into excuses).

(c) *Sixth Amendment claim.* Humphreys also claims that his Sixth Amendment fair cross-section right was violated, because eight of the nine excusals or deferments were granted to female potential jurors. The fair cross-section requirement does not require that juries mirror a community, and a state may provide reasonable exemptions for its jurors so long as the lists from which the jurors are drawn are representative of the community. *Taylor v. Louisiana*, 419 U. S. 522, 538 (VII) (95 SC 692, 42 LE2d 690) (1975). See also *Sanders v. State*, 237 Ga. 858, 858 (1) (230 SE2d 291) (1976) (applying this doctrine to grand jurors).

> The Constitution requires only that the State not deliberately and systematically exclude identifiable and distinct groups from jury lists; hence, in order to prevail on a constitutional challenge to the composition of the grand and petit juries in his case, a criminal defendant must establish prima facie that a distinct and identifiable group in the community is substantially under-represented on the jury venire.

*Torres v. State*, 272 Ga. 389, 391 (4) (529 SE2d 883) (2000).

Humphreys offered nothing to contradict the evidence in the record showing that the absolute disparity between females in the population of Cobb County and females on the grand jury list was 0.06 percent. Nor did he present any evidence purporting to show the effect the excusals and deferments of eight females had on the final grand jury list. Consequently, Humphreys has failed to carry his burden of establishing a prima facie case of grand jury discrimination. See *Sanders v. State*, 237 Ga. at 858 (1) (2% differential in women and 2.5% differential in black persons are "too slight to establish a prima facie case of purposeful discrimination").

3. Humphreys contends that the trial court erred in certifying the grand jury certificate pursuant to the Unified Appeal Procedure (U.A.P.), because white persons and Hispanic persons were allegedly under-represented on the Cobb County grand jury list.

(a) *U.A.P. claim.* The U.A.P. prohibits a variation between the community and the grand jury list of five percent or more of any cognizable group. Humphreys contends that we should reverse his death sentences based on a violation of this rule. See U.A.P. II (E). We have held, however, that it is beyond this Court's power to require the quashing of an indictment that was procured in a manner consistent with Georgia statutes and the state and federal constitutions, even if under-representation of a cognizable group on the grand jury list violates the U.A.P.'s five percent limit. See *Edwards v. State*, 281 Ga. 108, 110 (636 SE2d 508) (2006). Humphreys has not presented any reason to reconsider this precedent, and we see no basis for reversing a death sentence on this ground when we would not require the quashing of the underlying indictment.

(b) *Sixth Amendment claim.* Humphreys also contends that the trial court erred in denying his Sixth Amendment challenge to the grand jury array on the grounds that white persons and Hispanic persons were under-represented on the Cobb County grand jury list. In order to show a Sixth Amendment violation, Humphreys must show the group's cognizibility, under-representation, and systematic exclusion. See *Morrow v. State*, 272 Ga. 691, 692 (1) (532 SE2d 78) (2000). Because we find that Humphreys failed to show any actual under-representation of either group, we need not address the other requirements of his claim. See *Rice v. State*, 281 Ga. 149, 149 (1) (635 SE2d 707) (2006).

(i) *Hispanic persons.* Humphreys urges this Court to reconsider its use of citizenship statistics in reviewing the alleged under-representation of Hispanic persons on grand juries. See *Smith v. State*, 275 Ga. 715, 721 (4) (571 SE2d 740) (2002). We decline that request, but in any event, he has failed to show constitutionally significant under-representation. According to his own expert's testimony, the grand jury pool had an absolute disparity of less than

five percent both before and after adjusting to account for the citizenship rate of Hispanic persons. This is well within constitutional requirements. See *Cook v. State*, 255 Ga. 565, 571 (11) (340 SE2d 843) (1986) (holding that, in general, absolute disparities under ten percent satisfy constitutional requirements).

Humphreys also urges this Court to take both absolute and comparative disparity into account when considering smaller population groups such as Hispanic persons. However, we have consistently rejected the use of comparative disparity, see *Al-Amin v. State*, 278 Ga. 74, 79 (4) (597 SE2d 332) (2004); *Cook*, 255 Ga. at 571-574 (11), and we see no reason to reach a contrary conclusion in this case. The trial court did not err in denying Humphreys's challenge on this ground.

(ii) *White persons.* We need not address Humphreys's contention that the trial court erred in finding that the jury commissioners used the correct United States census figure in determining the total population for white persons in Cobb County. Even the 7.06 percent disparity that he alleges would be insufficient to establish a constitutional violation. *Cook*, 255 Ga. at 571 (11).

*Jury Selection Issues*

4. Humphreys asserts that the trial court erroneously disqualified for cause a prospective juror who was serving a probationary sentence for two felonies under the First Offender Act. See OCGA § 42-8-60 et seq. Contrary to the State's contention, Humphreys has not waived this claim. Humphreys opposed the State's motion to have the prospective juror excused for cause, and, once the trial court issued a ruling, he did not need to "further object or 'except' to the trial court's ruling in order to preserve the issue for appeal." *Davie v. State*, 265 Ga. 800, 802 (2) (463 SE2d 112) (1995).

The question is whether a prospective petit juror serving a sentence under the First Offender Act has been "convicted" within the meaning of OCGA § 15-12-163 (b) (5), which provides that, in jury trials in felony cases, either the State or the accused may object to the seating of a juror who "has been convicted of a felony in a federal court or any court of a state of the United States and the juror's civil rights have not been restored."[5] This appears to be a question of first impression for the appellate courts of this State.

Prior to the enactment of this statutory provision, "[i]n disqualifying jurors for offenses involving moral turpitude, our courts

---

[5] The qualifications of grand jurors are set forth in OCGA § 15-12-60, which similarly excludes as incompetent for service "[a]ny person who has been convicted of a felony and who has not been pardoned or had his or her civil rights restored." OCGA § 15-12-60 (b) (2).

follow[ed] common-law principles." *Turnipseed v. State*, 54 Ga. App. 442, 443 (188 SE 260) (1936). Under the common law, a person who was found guilty of a felony or other offense involving moral turpitude was considered " 'infamous,' and, by reason of that infamy, he was disqualified from jury service," because "at common law one accused of crime was entitled to a trial by twelve upright [jurors]." *Williams v. State*, 12 Ga. App. 337, 338-339 (77 SE 189) (1913). Under both the common law and this State's case law, however, "in order to disqualify a juror by reason of his conviction of a crime involving moral turpitude, his guilt must be shown by a judgment." *Turnipseed*, 54 Ga. App. at 443. " '[I]t is the judgment that disqualifies.' . . . [H]ence the use of the word 'conviction' as denoting final judgment." Id. (citation omitted). Accord *Turnipseed v. State*, 53 Ga. App. 194 (185 SE 403) (1936) (holding that a juror was not incompetent to serve while his petition for certiorari to review his conviction was pending).

"The common-law rules are still of force and effect in this State, except where they have 'been changed by express statutory enactment or by necessary implication.' " *Fortner v. Town of Register*, 278 Ga. 625, 626 (1) (604 SE2d 175) (2004) (citation omitted). We see no indication that the General Assembly intended to change the common law in this regard. Instead, over a quarter-century before the legislature amended OCGA § 15-12-163 to expressly provide for the excusal for cause of potential jurors who have been "convicted" of a felony, see Ga. L. 1995, p. 1292, § 11, the General Assembly defined the term "conviction" in the Criminal Code as "a *final judgment* of conviction entered upon a verdict or finding of guilty of a crime or upon a plea of guilty." See Ga. L. 1968, p. 1249, § 1 (emphasis supplied). This definition remains the same today. See OCGA § 16-1-3 (4).

The First Offender Act permits the trial court, "[u]pon a verdict or plea of guilty or a plea of nolo contendere, but *before an adjudication of guilt*," to place the first offender on probation or to sentence the first offender to a term of confinement *"without entering a judgment of guilt."* OCGA § 42-8-60 (a) (emphasis supplied).[6] Accordingly, we have held that "[a] first offender's guilty plea does not constitute a 'conviction' as that term is defined in the Criminal Code of Georgia." *Davis v. State*, 269 Ga. 276, 277 (2) (496 SE2d 699) (1998). Furthermore, a first-offender probationer is automatically discharged upon the successful completion of the

---

[6] We also note that a plea of nolo contendere "shall not be deemed a plea of guilty for the purpose of effecting any civil disqualification of the defendant to . . . serve upon any jury." OCGA § 17-7-95 (c).

terms of the sentence without the necessity of any subsequent certification of that successful completion in the records of the trial court. See *State v. Mills*, 268 Ga. 873, 875 (495 SE2d 1) (1998); OCGA § 42-8-62 (a).

While the legislature has amended the Code to restrict a first offender's liberties in certain respects, see OCGA § 16-11-131 (b) (prohibiting first offenders from possessing a firearm); OCGA § 42-1-12 (a) (8) (requiring first offenders charged with sex crimes and certain crimes against children to register as sexual offenders), it has not done so with respect to a first offender's eligibility for jury service. For these reasons, we conclude that a person who has been placed on probation or sentenced to a term of confinement pursuant to the First Offender Act is not incompetent to serve as a petit juror under OCGA § 15-12-163 (b) (5) either before or after being discharged without an adjudication of guilt. The trial court therefore erred in disqualifying for cause the prospective juror solely on the ground that she was a first offender on probation.

Nevertheless, " '[t]he erroneous allowing of a challenge for cause affords no ground of complaint if a competent and unbiased jury is finally selected.' " *Wells v. State*, 261 Ga. 282, 282-283 (2) (404 SE2d 106) (1991) (citation omitted). Compare *Harris v. State*, 255 Ga. 464, 464 (2) (339 SE2d 712) (1986) (erroneous *denial* of a challenge for cause, which allows an incompetent juror to serve, requires reversal without a showing of actual prejudice). Because Humphreys has not shown that the 12 jurors who actually were selected to decide his case were incompetent or biased, this error is not a basis for reversal.

5. Humphreys argues that the trial court erred by refusing to excuse six prospective jurors because they were biased in favor of the death penalty. Conversely, Humphreys complains that the trial court erred by excusing three prospective jurors based on the court's determination that they evidenced an inability to consider a death sentence. Humphreys cites *Allen v. State*, 248 Ga. 676 (286 SE2d 3) (1982), for the proposition that a prospective juror "must make it 'unmistakably clear' that he or she would automatically vote against the death penalty in any and all cases" in order to be disqualified. Id. at 679 (2) (quoting *Witherspoon v. Illinois*, 391 U. S. 510, 516, n. 9 (88 SC 1770, 20 LE2d 776) (1968)). His reliance on *Allen* is misplaced.

Since *Allen* and *Witherspoon* were decided, this Court, following the United States Supreme Court, has explained that "[t]he proper standard for determining the disqualification of a prospective juror based upon his views on capital punishment 'is whether the juror's views would " 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " ' " *Greene v. State*, 268 Ga. 47, 48 (485 SE2d 741) (1997)

(quoting *Wainwright v.Witt*, 469 U. S. 412, 424 (II) (105 SC 844, 83 LE2d 841) (1985) (citation omitted)). "This standard does not require that a juror's bias be proved with 'unmistakable clarity.' " Id. (citation omitted). Instead,

> [t]he relevant inquiry on appeal is whether the trial court's finding that a prospective juror is disqualified is supported by the record as a whole. An appellate court . . . must pay deference to the trial court's determination. This deference encompasses the trial court's resolution of any equivocations and conflicts in the prospective jurors' responses on voir dire. Whether to strike a juror for cause is within the discretion of the trial court and the trial court's rulings are proper absent some manifest abuse of discretion.

Id. at 49-50 (citations omitted). "The same standard applies to a court's decision to qualify a prospective juror over defendant's objection." *Tollette v. State*, 280 Ga. 100, 102 (3) (621 SE2d 742) (2005).

A review of the record shows that the responses of prospective jurors Weaver, Hudson, and O'Quinn regarding their ability to impose a death sentence were equivocal and contradictory. The trial court was authorized to find from the totality of their responses that they could not meaningfully consider all three sentencing options and, accordingly, that they would be substantially impaired in the performance of their duties as jurors in a capital case. See *Greene*, 268 Ga. at 50.

By contrast, a review of the voir dire transcript of prospective jurors McCollum, Goodbread, Buckley, Parker, Burkey, and Beckham shows that, while each of these jurors expressed a leaning toward the death penalty, they all stated that they would listen to and consider mitigating evidence and that they could give fair consideration to and vote for each of the three sentencing options. We therefore conclude that the trial court did not abuse its discretion by denying Humphreys's motions to disqualify these six prospective jurors. See *Tollette*, 280 Ga. at 102 (3). See also *Pace v. State*, 271 Ga. 829, 834 (7) (524 SE2d 490) (1999) (holding that a prospective juror is not subject to excusal for cause for merely leaning toward a death sentence).

### *Guilt/Innocence Phase Issues*

6. Humphreys contends that, after a hearing pursuant to *Jackson v. Denno*, 378 U. S. 368 (84 SC 1774, 12 LE2d 908) (1964), the trial court erred by failing to exclude his statement to police officers

made while he was in custody, because the State failed to show that he made a knowing and intelligent waiver of his rights under *Miranda v. Arizona*, 384 U. S. 436 (86 SC 1602, 16 LE2d 694) (1966).

> In ruling on the admissibility of an in-custody statement, a trial court must determine whether, based upon the totality of the circumstances, a preponderance of the evidence demonstrates that the statement was made freely and voluntarily. Unless clearly erroneous, a trial court's findings as to factual determinations and credibility relating to the admissibility of the defendant's statement at a *Jackson v. Denno* hearing will be upheld on appeal.

*Harvey v. State*, 274 Ga. 350, 351-352 (1) (554 SE2d 148) (2001) (citations and punctuation omitted).

The evidence at the *Jackson v. Denno* hearing showed the following. On November 9, 2003, Cobb County Detectives Herman and Sears arrived at the Waukesha County, Wisconsin, Sheriff's Department, where Humphreys had been in custody for 27 hours. Waukesha County officers checked Humphreys out of the jail and escorted him to the nearby investigations office for the interview, which began shortly after 3:00 p.m. and ended at approximately 4:45 p.m. Humphreys was handcuffed and shackled at the ankles when he arrived at the interview room. Before the interview began, however, the handcuffs were removed, and Humphreys was offered something to eat and drink and an opportunity to use the restroom.

Herman testified that he introduced himself and Sears to Humphreys as officers from Cobb County, explained that they had an arrest warrant from that county charging Humphreys with two counts of murder, and told him that the detective needed to advise him of his *Miranda* rights. Humphreys responded by stating that he was not going to sign anything, but he continued to talk about the case. Herman then stopped Humphreys and read the *Miranda* warnings to him from a card that the detective carried with him. Herman asked Humphreys whether he understood the rights that had just been explained and whether, having those rights in mind, he wished to talk to the detectives. Humphreys responded affirmatively to both questions and subsequently agreed to allow the interview to be audiotaped. Thus, Herman's advising Humphreys of the *Miranda* rights was not recorded on the audiotape. However, Humphreys twice acknowledged near the beginning of the tape that he had previously been advised of and understood his rights.

At the time of the interview, Humphreys was 30 years old and had a high school degree and additional education, as well as prior experience as a criminal defendant. Herman testified that Hum-

phreys's general demeanor was "very sullen," explaining that "his shoulders were slumped" and "his head [was] hung." But Herman also testified that Humphreys appeared to be awake and alert, that he appeared to understand Herman's questions regarding his rights, that he did not appear to be under the influence of drugs or alcohol, and that he had no concerns about Humphreys's mental state. Herman further testified that Humphreys never indicated that he did not want to talk with the officers, that no promises or threats were made to Humphreys, and that both detectives were unarmed during the interview and did not touch Humphreys except to shake his hand at the end of the interview.

A review of the taped statement shows that Humphreys told the detectives that he was on blood pressure medicine but that he did not abuse drugs or alcohol. It also supports Herman's testimony that, although Humphreys was not crying when the interview began, he "broke down" a couple of times during his statement. The fact that Humphreys became emotional during his statement is not sufficient to render it involuntary. See *Estes v. State*, 224 Ga. 687, 688 (2) (164 SE2d 108) (1968).

Nor does Humphreys's refusal to sign a *Miranda* form render his statement involuntary and inadmissible. *Kelly v. State*, 250 Ga. App. 793, 794 (553 SE2d 175) (2001). See also *North Carolina v. Butler*, 441 U. S. 369, 373 (99 SC 1755, 60 LE2d 286) (1979) ("An express written or oral statement of waiver of the right to remain silent or of the right to counsel is usually strong proof of the validity of that waiver, but is not inevitably either necessary or sufficient to establish waiver."). It is certainly the better practice for law enforcement officers to record the reading of *Miranda* rights to a defendant and the subsequent waiver of those rights, particularly in a case such as this where the defendant refuses to sign a waiver form. Nevertheless, given the testimony of the detective who interviewed Humphreys and the audiotape of his statement submitted as evidence at the *Jackson-Denno* hearing, we cannot say that the trial court erred in finding that Humphreys was properly advised of his *Miranda* rights and that his statement was given voluntarily. The statement was, therefore, properly admitted at trial. See *Harvey*, 274 Ga. at 351-352 (1).

7. Humphreys argues that the trial court erred in denying his motion to suppress evidence seized as a result of the warrantless search of the vehicle he was driving at the time of his arrest. The evidence at the motion to suppress hearing showed that, after the Cobb County police determined that Humphreys had left his home on foot on the morning of November 7, 2003, they learned that he had rented a vehicle and departed the area. Subsequently, police arranged with the U. S. Marshals Service for the issuance of a

nationwide "Attempt to Locate" (ATL) lookout notice for Humphreys and his rental vehicle.

Officer Paul Schmitt of the Brookfield, Wisconsin, Police Department testified that he was on patrol when he received the lookout notice at 5:16 a.m. on November 8, 2003. The lookout was for a silver Jeep Grand Cherokee with a Budget rental car company license-applied-for or "paper" tag. It identified Humphreys by name as the driver of the Jeep, gave his date of birth, and described him as a white male, six feet three inches tall, 295 pounds, and bald. The lookout also stated that, according to the U. S. Marshals Service, Humphreys was a suspect in a double homicide in Georgia, was considered to be armed and dangerous, was possibly attempting to flee the country, was being tracked by his cellular telephone signal, and was last known to be near Schmitt's vicinity traveling on Interstate 94.

Schmitt drove to Interstate 94 to observe the passing traffic, which was light because it was an early Saturday morning. At approximately 5:30 a.m., the officer observed a silver Jeep Grand Cherokee with a paper tag pass his vehicle, and he began to follow it from a distance of four to five car lengths. Schmitt notified Waukesha County communications that he was following the suspect vehicle, and other officers were dispatched to assist him. A few minutes later, the officers activated their blue lights and sirens. In response, the Jeep rapidly accelerated, leading to a 35-minute high-speed chase before Humphreys's vehicle finally crashed and he was apprehended.

Humphreys contends that the police officers' initial attempt to stop his rental vehicle pursuant to the lookout was illegal because the officers relied solely on the description of the vehicle as the basis for the stop. Humphreys asserts he was therefore justified in accelerating his vehicle and attempting to flee from the officers and that all items seized subsequent to his arrest should have been suppressed.

"A vehicle stop pursuant to a police lookout requires specific and articulable facts which, together with rational inferences drawn therefrom, reasonably warrant the intrusion." *Brown v. State*, 278 Ga. 724, 727 (2) (609 SE2d 312) (2004). At the time of the attempted stop of Humphreys's vehicle, the police had a description of its make, model, color, and paper temporary rental vehicle tag. They knew that the vehicle was being tracked by a cellular telephone signal to the area and highway where it was first sighted. The light traffic during the early morning hours and the short time between the transmission of the lookout and Officer Schmitt's spotting the vehicle made it even more likely that the vehicle he saw was in fact the vehicle described in the lookout. Accordingly, the trial court did not err in finding that the police had sufficient information to provide them

"with the requisite particularized basis to warrant the investigative stop." *Thomason v. State*, 268 Ga. 298, 301 (2) (a) (486 SE2d 861) (1997). The officers were not required to await the commission of a traffic offense in their presence before conducting an investigative stop. See *id.* at 301-302 (2) (a).

It is undisputed that, when the police activated their lights and sirens, Humphreys accelerated and attempted to flee, traveling at up to 110 miles per hour, driving recklessly through residential areas, running stop signs, and swerving off the road. His vehicle came to a stop only after running over multiple sets of "stop sticks" set out by law enforcement and after the police rammed the vehicle in a "pit" maneuver, pushing it into a concrete edifice in a medical center parking lot. Humphreys's commission of the offense of fleeing and attempting to elude police, during which he also violated numerous traffic laws, provided the officers with ample probable cause for his arrest. Moreover, once Humphreys was stopped, the information contained in the lookout also provided sufficient probable cause for the officers to detain him on the Cobb County charges. See *Burgeson v. State*, 267 Ga. 102, 105 (475 SE2d 580) (1996) (explaining that probable cause for arrest "can rest upon the collective knowledge of the police when there is some degree of communication between them"). Thus, the trial court did not err in finding that Humphreys's arrest was lawful.

The trial court also concluded that, because Humphreys was a recent occupant of the Jeep at the time of his arrest, the search of the vehicle's contents was valid under *New York v. Belton*, 453 U. S. 454, 460 (101 SC 2860, 69 LE2d 768) (1981) (holding that when police have "made a lawful custodial arrest of the occupant of an automobile, [they] may, as a contemporaneous incident of that arrest, search the passenger compartment of that automobile"). Humphreys claims that the trial court's finding was erroneous in light of the subsequent decision of the United States Supreme Court in *Arizona v. Gant*, 556 U. S. ___ (129 SC 1710, 173 LE2d 485) (2009). In *Gant*, the Supreme Court significantly limited its decision in *Belton* by holding that police officers are authorized "to search a vehicle incident to a recent occupant's arrest only when the arrestee is unsecured and within reaching distance of the passenger compartment at the time of the search" or "when it is 'reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle,' " which will often not be the case when the arrest is for traffic violations. *Id.* at ___ (129 SC at 1719) (citation omitted).

We need not determine whether the search of the Jeep after Humphreys's arrest was valid under *Gant*, however, because it is apparent that the evidence seized from the vehicle would have been discovered during the subsequent inventory of the vehicle and that it

was therefore admissible under the inevitable discovery rule. See *Mathis v. State*, 279 Ga. 100, 102 (3) (a) (610 SE2d 62) (2005) (explaining that "[w]e will affirm a trial court's ruling if it is right for any reason").

The State presented uncontradicted testimony at the suppression hearing establishing that an inventory search of the Jeep was conducted in connection with its impoundment by the Waukesha County Sheriff's Office. "The state may inventory the contents of a car that has been lawfully impounded." *Sams v. State*, 265 Ga. 534, 535 (3) (459 SE2d 551) (1995). The test is whether, under the circumstances, the officer's conduct in impounding the vehicle was reasonable within the meaning of the Fourth Amendment. *Wright v. State*, 276 Ga. 454, 461 (5) (579 SE2d 214) (2003).

Here, Humphreys was the sole occupant of an out-of-state rental vehicle in which he was suspected of attempting to flee the country, there was a lookout for him in connection with a double homicide in a state hundreds of miles away, and he had been arrested and taken into custody after an extended high-speed chase through multiple jurisdictions. The evidence at the hearing also showed that every one of the vehicle's tires had been damaged or destroyed during the pursuit, rendering the vehicle unsafe if not impossible to drive, and that it remained at the drive-through entrance to a medical facility, where the vehicle had jumped the curb and had come to rest with its right front wheel on the sidewalk. In short, the vehicle was clearly connected to Humphreys's arrest; it was a rental vehicle in which Humphreys had been the sole occupant; and it was unsafe to drive, illegally and dangerously parked, and a hazard to traffic. Under these circumstances, the inventory search and impoundment of the Jeep were entirely reasonable and the evidence seized during the search was properly admitted. See *Goodman v. State*, 255 Ga. 226, 229 (13) (336 SE2d 757) (1985) (upholding search of a defendant's automobile where he had been arrested and his car impounded pursuant to a radio lookout); *Pierce v. State*, 194 Ga. App. 481, 481-482 (1) (391 SE2d 3) (1990) (upholding inventory search where the defendant, who had been arrested for driving with a suspended license, was the sole occupant of an out-of-state rental vehicle).

### Sentencing Phase Issues

8. During the sentencing phase, the jury had deliberated for approximately eight hours over a period of two days when the jury foreperson sent the trial court a note stating:

> We, the jury, have agreed on statutory aggravating circumstances on both counts, but not on the penalty. Currently we

> agreed life imprisonment with parole is not an acceptable option. We are currently unable to form a unanimous decision on death or life imprisonment without parole. Please advise.

The trial court informed the parties of the note, summarizing its contents as follows:

> [The jurors have] indicated that they have reached a verdict in regard to some of the issues that have been submitted to them, but have not yet reached a decision on other issues that were submitted to them.

The court then informed counsel of its intention to instruct the jury to continue deliberations. The trial court later placed the note in the record.

(a) We find no merit to Humphreys's contention that, by its denial of defense counsel's request to disclose the contents of the note verbatim, the trial court deprived Humphreys of "a full opportunity to suggest an appropriate response." *Lowery v. State*, 282 Ga. 68, 76 (6) (646 SE2d 67) (2007). The trial court's summary of the note enabled Humphreys's experienced defense counsel to infer that the jurors had agreed on at least one statutory aggravating circumstance but had not agreed as to the sentence; had the jury agreed on any other issue it was considering (the absence of a statutory aggravating circumstance or the sentence), there would have been no need for further deliberations. Consequently, Humphreys was not meaningfully hindered in formulating a response. Furthermore, while Humphreys objected to the trial court's intention to instruct the jury to continue deliberations, he has not shown what different or further action he would have taken had the trial court read the note verbatim. See *Carson v. State*, 241 Ga. 622, 626 (3) (247 SE2d 68) (1978) ("The burden is on the appellant to show harm as well as error.").

(b) We also find no merit to Humphreys's contention that, after receiving this note, the trial court erred in failing to discharge the jury and sentence him to life without the possibility of parole. See OCGA § 17-10-31.1 (c) (requiring the trial court to impose either a sentence of life or life without parole where a death penalty sentencing jury has unanimously agreed on at least one statutory aggravating circumstance but is unable to reach a unanimous verdict as to sentence) (repealed by Ga. L. 2009, p. 223, § 6, effective April 29, 2009); *Hill v. State*, 250 Ga. 821, 821 (301 SE2d 269) (1983). Whether a jury is hopelessly deadlocked is a sensitive determination best made by the trial court that has observed the trial and the jury. It will

be reversed on appeal only for an abuse of that discretion. *Romine v. State*, 256 Ga. 521, 525 (1) (b) (350 SE2d 446) (1986). Here, after a lengthy trial, the jury had been deliberating for less than nine hours, and the language twice used in the note that the jurors "currently" were not able to agree indicated that deliberations were ongoing. Under the circumstances, we cannot say that the trial court abused its discretion in requiring further deliberations.

9. After being instructed to continue, the jury deliberated for about three more hours. The jury foreperson then sent a note to the trial court requesting that the jurors be allowed to rehear Humphreys's taped statement to the detectives. After listening to the statement, the jurors resumed their deliberations. About two hours later, Humphreys moved for a mistrial. The trial court denied the motion, noting that there had been no indication from the jury that it was deadlocked.

After approximately two more hours, the trial court received a note from a juror asking to be removed from the jury "[d]ue to the hostile nature of one of the jurors." After reading the note to the parties, the trial court informed counsel that it intended to give the jury a modified *Allen* charge. See *Allen v. United States*, 164 U. S. 492, 501 (9) (17 SC 154, 41 LE 528) (1896). Based on this last juror communication, Humphreys renewed his motion for mistrial, which again was denied.

After reading the juror's note to the jury without identifying from whom it came, the trial court gave a modified *Allen* charge.[7]

---

[7] The trial court's charge was as follows, with the two specific portions challenged by Humphreys emphasized:

The Court deems it advisable at this time to give you some instruction in regard to the manner in which you should be conducting your deliberations in the case. You've been deliberating upon this case for a period of time. The Court deems it proper to advise you further in regard to the desirability of agreement, if possible.

The case has been exhaustively and carefully tried by both sides and has been submitted to you for decision and verdict, if possible, and not for disagreement. *It is the law that a unanimous verdict is required.*

While this verdict must be the conclusion of each juror independently, and not a mere acquiescence of the jurors in order to reach an agreement, it is nevertheless necessary for all the jurors to examine the issues and the questions submitted to them with candor and with fairness and with a proper regard for in [sic] deference to the opinion of each other.

*A proper regard for the judgment of others will greatly aid us in forming our own judgment.* Each juror should listen with courtesy to the arguments of the other jurors with the disposition to be convinced by them.

If the members of the jury differ in their view of the evidence, the difference of opinion should cause them all to scrutinize the evidence more carefully and closely and to reexamine the grounds of their own opinion.

Your duty is to decide the issues that have been submitted to you if you can consciously [sic] do so. In conferring, you should lay aside all mere pride of opinion and should bear in mind that the jury room is no place for hostility or taking up and maintaining in a spirit of controversy either side of the cause.

The jury resumed its deliberations at 8:40 p.m. and retired for the evening at 10:20 p.m. After deliberating for two hours the following morning, the jury returned death sentences for the two murders.

(a) *Motions for mistrial.* Humphreys contends that the trial court erred in denying his requests that it find the jury deadlocked and his subsequent motions for a mistrial on that ground. Given the length of the trial in relation to the time the jury had been deliberating and the fact that the jurors had recently requested to rehear evidence, indicating that they were actively deliberating, the trial court did not abuse its discretion in denying Humphreys's motions. See *Sears v. State,* 270 Ga. 834, 837 (1) (514 SE2d 426) (1999) (upholding a modified *Allen* charge given after the jury had been deliberating for nine hours and had twice informed the trial court that it was deadlocked).

(b) *Allen charge.* While the trial court made a few inconsequential slips of the tongue and harmless additions, the *Allen* charge given in this case substantially followed the pattern charge. See Suggested Pattern Jury Instructions, Vol. II: Criminal Cases, § 1.70.70 (3d ed. 2005). Humphreys nevertheless contends that two portions of the trial court's *Allen* charge rendered it unduly coercive. There is no merit to Humphreys's argument that the trial court coerced the jury to reach a verdict by injecting its personal feelings into the deliberations, in charging that "[a] proper regard for the judgment of others will greatly aid *us* in forming *our* own judgment" (emphasis supplied). While unfortunately colloquial for such an important and often-used instruction, this passage, when read in context, clearly refers to the judgment of the jurors, not the trial court, and in any event it does not suggest what judgment, if any, the court had at the time. Compare *McMillan v. State,* 253 Ga. 520, 523 (4) (322 SE2d 278) (1984) (requiring reversal where, after its *Allen* charge, the trial court stated, "I feel like there is enough evidence in this case for you to reach a verdict one way or the other").

Humphreys also maintains that the instruction, "[i]t is the law that a unanimous verdict is required," is an incorrect statement of the law in the sentencing phase of a death penalty case, because Georgia's death penalty statute provides that, if the jury considering the death penalty cannot reach unanimity as to which of the three

---

You should bear in mind at all times that, as jurors, you should not be advocates for either side of the case. You should keep in mind the truth as it appears from the evidence, examined in the light of the instructions that the Court has given to you.

You may, again, retire to the jury room for a reasonable time, examine your differences in a spirit of fairness and candor and courtesy, and try to arrive at a verdict if you can conscientiously do so. At this time, you may return to the jury room.

sentencing options to recommend, the trial court is required to dismiss the jury and to sentence the defendant to either life or life without parole. See OCGA § 17-10-31.1 (c) (repealed by Ga. L. 2009, p. 223, § 6, effective April 29, 2009).

With regard to this issue, Humphreys submitted with his motion for new trial the affidavits of one juror and of two investigators who interviewed a second juror, which allege that the jury misunderstood the law. However, because the proposed affidavit of the juror does not fall within any exception to OCGA § 17-9-41 (providing that jurors' affidavits "may be taken to sustain but not to impeach their verdict"), the trial court correctly declined to consider it. See *Gardiner v. State*, 264 Ga. 329, 332 (2) (444 SE2d 300) (1994) (holding that the limited exceptions to OCGA § 17-9-41 do not include jurors' misapprehension regarding the law). Likewise, the trial court did not err in disregarding the two investigators' affidavits, because " 'if a verdict may not be impeached by an affidavit of one or more of the jurors who found it, certainly it cannot be impeached by affidavits from third persons, establishing the utterance by a juror of remarks tending to impeach his verdict.' " *Washington v. State*, 285 Ga. 541, 544 (3) (a) (iv), n. 11 (678 SE2d 900) (2009) (citation omitted).

Our task is to determine whether the *Allen* charge in Humphreys's case, considered as a whole, was "so coercive as to cause a juror to 'abandon an honest conviction for reasons other than those based upon the trial or the arguments of other jurors.' " *Mayfield v. State*, 276 Ga. 324, 330 (578 SE2d 438) (2003) (citation omitted). Humphreys maintains that the instruction misled the jurors into believing that, if they were unable to reach a unanimous verdict, Humphreys would receive a life sentence or could even be released and that such a misunderstanding of the law coerced one or more jurors into abandoning their honest convictions in order to reach a unanimous verdict of death.

This Court has previously considered the same "a unanimous verdict is required" instruction given as part of an *Allen* charge in the sentencing phase of a death penalty trial. In *Legare v. State*, 250 Ga. 875 (302 SE2d 351) (1983), we stated that "it is true that any 'verdict' rendered [in the sentencing phase] must be unanimous and thus also true, stated in isolation, that it is 'the law that a unanimous verdict is required.' " Id. at 876 (1). As we later explained in a related context, in Georgia a unanimous verdict is required even in the sentencing phase of a capital case because under our death penalty law, "[w]here a jury is unable to agree on a verdict, that disagreement is not itself a verdict." *Romine*, 256 Ga. at 525 (1) (b). The jury's deadlock may lead to a sentence of life with or without parole imposed by the trial court, but it does not result either in a mistrial

subject to retrial (as in other contexts where a jury deadlocks) or an automatic verdict (as occurs under the death penalty law of other states). Id.[8] Moreover, we have repeatedly held that a trial court is not required to instruct the jury in the sentencing phase of a death penalty trial about the consequences of a deadlock. See *Jenkins v. State*, 269 Ga. 282, 296 (26) (498 SE2d 502) (1998).

For these reasons, the "a unanimous verdict is required" instruction is technically a correct statement of the law even in the context of the sentencing phase of a death penalty trial. Nevertheless, because this charge may lead to claims of jury confusion that require detailed analysis of the full circumstances of the jury instructions given, the better practice is to omit this language from *Allen* charges given during the sentencing phase of death penalty trials. To the extent that *Legare*, 250 Ga. at 876 (1), suggests that this instruction will always survive such review, it is overruled.

Turning to that broader review, we note that the complained-of charge was a small portion of the extensive *Allen* charge given. As we have emphasized before, that charge also

> cautioned the jurors that the verdict was not to be the . . . "mere acquiescence [of the jurors] in order to reach an agreement," that any difference of opinion should cause the jurors to "scrutinize the evidence more [carefully and] closely" and that the aim was to keep the truth in view as it appeared from the evidence, considered in light of the court's instructions.

*Mayfield*, 276 Ga. at 330 (2) (b) (citation and punctuation omitted). In addition, following the publication of the verdicts, the jury was polled, and each of the jurors affirmed that the verdicts announced were the verdicts that he or she had reached and that each juror had reached those verdicts without any pressure from anyone during his or her deliberations. Id. In light of these circumstances and the full course of the jury's deliberations in this case, "[w]e conclude that, because the [a unanimous verdict is required] language constituted but one small portion of an otherwise balanced and fair *Allen* charge, it did not render the charge impermissibly coercive," *Burchette v. State*, 278 Ga. 1, 3 (596 SE2d 162) (2004), and it does not require reversal of Humphreys's death sentences.

---

[8] For this same reason, the Court in *Legare* held that the charge, "This case must be decided by some Jury," was error in the context of the sentencing phase of a death penalty case, because if the jury is deadlocked, there is no mistrial and new sentencing trial held before a new jury. See 250 Ga. at 876-877 (1). The trial court in this case properly did not give that incorrect instruction.

*Sentence Review*

10. The jury recommended a death sentence for Cindy Williams's murder based on the following five statutory aggravating circumstances: the murder was committed while the defendant was engaged in the commission of kidnapping with bodily injury, a capital felony; the murder was committed while the defendant was engaged in the commission of armed robbery, a capital felony; the murder was committed for the purpose of receiving money or any other thing of monetary value; the murder was outrageously or wantonly vile, horrible, or inhuman in that it involved torture and an aggravated battery to the victim before death and involved the depravity of mind of the defendant; and the murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest. See OCGA § 17-10-30 (b) (2), (7), (10). The jury recommended a death sentence for Lori Brown's murder based on its finding of these same five statutory aggravating circumstances. This Court is required to review each statutory aggravating circumstance and to determine if it is supported by the evidence. See OCGA § 17-10-35 (c) (2). As part of this review, we conclude that the (b) (10) statutory aggravating circumstance found as to each victim is not supported by the evidence, although this conclusion does not affect the death sentences imposed.

OCGA § 17-10-30 (b) (10) provides that the death penalty may be imposed where the evidence authorizes the jury to find beyond a reasonable doubt that "[t]he murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or custody in a place of lawful confinement, of himself or another." The State contended at trial that killing a witness to a crime is a means of avoiding, interfering with, or preventing lawful arrest and that the evidence showed that, once Humphreys obtained the victims' ATM cards and PINs, he murdered the victims because he knew that he would be apprehended if he left them alive.

The broad reading of the (b) (10) statutory aggravating circumstance that the State advocates would permit it to apply in almost any case in which a defendant is accused of committing a murder in close connection with another crime — a very typical murder case. In all such cases, it could be said that the elimination of an eyewitness — the murder victim — would help the defendant avoid arrest, and argued that such a purpose may be inferred. While the language of the statute may be susceptible to that reading, such a broad construction would be inconsistent with the purpose of statutory aggravating circumstances, which is to provide a "meaningful basis for distinguishing the few cases in which (the death penalty) is imposed from the many cases in which it is not." *Furman v. Georgia*,

408 U. S. 238, 313 (92 SC 2726, 33 LE2d 346) (1972) (White, J., concurring). We do not doubt that killing a witness to a crime may be done, under certain circumstances, clearly for the purpose of avoiding, interfering with, or preventing lawful arrest. But the circumstances of this case do not establish such a clear purpose behind the murder of the two victims.

We note that our cases to date have upheld the (b) (10) circumstance only where the evidence supported a finding that the defendant was, at the time of the murder, in immediate peril of being lawfully arrested, placed in custody, or confined in a place of lawful confinement by a law enforcement officer. See *Brannan v. State*, 275 Ga. 70, 70, 85 (28) (561 SE2d 414) (2002) (finding sufficient evidence to support the (b) (10) circumstance where the defendant murdered a police officer who stopped him for speeding); *Holsey v. State*, 271 Ga. 856, 857, n. 1, 858 (1) (524 SE2d 473) (1999) (finding sufficient evidence where the defendant fled after robbing a food store and then shot a police officer who was approaching his vehicle to arrest him); *Speed v. State*, 270 Ga. 688, 688, 690 (1) (512 SE2d 896) (1999) (finding sufficient evidence where the defendant, a known drug dealer, shot an officer who had threatened to "catch him dirty" in the back of the head while the officer was frisking another suspect); *Henry v. State*, 269 Ga. 851, 851, 853 (1) (507 SE2d 419) (1998) (finding sufficient evidence where the defendant murdered an officer to avoid a search of his bag, which he feared would reveal his pistol and lead to his arrest for being a felon in possession of a firearm); *Collier v. State*, 244 Ga. 553, 572 (261 SE2d 364) (1979) (finding sufficient evidence where the defendant killed a police officer while fleeing a "pat down" after he committed a robbery), overruled on other grounds by *Thompson v. State*, 263 Ga. 23, 25 (2) (426 SE2d 895) (1993); *Willis v. State*, 243 Ga. 185, 185, 191 (17) (253 SE2d 70) (1979) (finding sufficient evidence where the defendant abducted and murdered an officer who attempted to arrest him and his companions after they committed an armed robbery). Compare *Stevens v. State*, 247 Ga. 698, 708-709 (22) (278 SE2d 398) (1981) (reversing the jury's finding of the (b) (10) circumstance where the defendant killed a police officer who had stopped him for questioning but where the State "did not prove a technically lawful arrest of the offender"). While such cases fall clearly within the scope of the (b) (10) statutory aggravating circumstance, we reiterate that the Code section is not limited to that situation. We hold today only that the (b) (10) circumstance does not extend as far as the situation presented in this case, and therefore we must set aside the (b) (10) circumstances with respect to the murders of both victims here.

We need not reverse Humphreys's death sentences, however, because they both remain supported by at least one valid statutory

aggravating circumstance. See *Colwell v. State*, 273 Ga. 634, 642 (11) (d) (544 SE2d 120) (2001). Viewed in the light most favorable to the jury's verdict, we conclude that the evidence, as summarized in Division 1 above, was clearly sufficient to authorize a rational trier of fact to find beyond a reasonable doubt the existence of the remaining statutory aggravating circumstances as to each victim in this case. See *Jackson v. Virginia*, 443 U. S. at 319 (III) (B); OCGA § 17-10-35 (c) (2).

11. Upon a review of the trial record, we conclude that Humphreys's death sentence was not imposed under the influence of passion, prejudice, or any other arbitrary factor. See OCGA § 17-10-35 (c) (1).

12. In reviewing the proportionality of the death sentences in Humphreys's case as required by OCGA § 17-10-35 (c) (3), we have considered "whether the death penalty is 'excessive per se' or if the death penalty is 'only rarely imposed . . . or substantially out of line' for the type of crime involved and not whether there *ever* have been sentences less than death imposed for similar crimes." *Gissendaner v. State*, 272 Ga. 704, 717 (19) (532 SE2d 677) (2000) (citations omitted; emphasis in original). The cases in the appendix support the imposition of the death penalty in this case in that all involved a deliberate murder committed for the purpose of receiving money or any other thing of monetary value or involved an armed robbery, kidnapping with bodily injury, the (b) (7) statutory aggravating circumstance, and/or evidence that the defendant murdered multiple persons. See OCGA § 17-10-35 (e). Thus, the cases in the appendix show the willingness of juries in Georgia to impose the death penalty under such circumstances. We find that, considering the crimes and the defendant, the sentences of death in this case are not disproportionate punishment.

*Judgment affirmed. Hunstein, C. J., Benham, Thompson, and Melton, JJ., and Judge John J. Ellington concur. Carley, P. J., concurs specially. Hines, J., not participating.*

APPENDIX.

*O'Kelley v. State*, 284 Ga. 758 (670 SE2d 388) (2008); *Rivera v. State*, 282 Ga. 355 (647 SE2d 70) (2007); *Lewis v. State*, 279 Ga. 756 (620 SE2d 778) (2005); *Perkinson v. State*, 279 Ga. 232 (610 SE2d 533) (2005); *Sealey v. State*, 277 Ga. 617 (593 SE2d 335) (2004); *Braley v. State*, 276 Ga. 47 (572 SE2d 583) (2002); *Terrell v. State*, 276 Ga. 34 (572 SE2d 595) (2002); *Arevalo v. State*, 275 Ga. 392 (567 SE2d 303) (2002); *Fults v. State*, 274 Ga. 82 (548 SE2d 315) (2001); *Butts v. State*, 273 Ga. 760 (546 SE2d 472) (2001); *Colwell v. State*, 273 Ga. 634 (544 SE2d 120) (2001); *King v. State*, 273 Ga. 258 (539

SE2d 783) (2000); *Esposito v. State*, 273 Ga. 183 (538 SE2d 55) (2000); *Morrow v. State*, 272 Ga. 691 (532 SE2d 78) (2000); *Bishop v. State*, 268 Ga. 286 (486 SE2d 887) (1997); *Jones v. State*, 267 Ga. 592 (481 SE2d 821) (1997); *McClain v. State*, 267 Ga. 378 (477 SE2d 814) (1996); *McMichen v. State*, 265 Ga. 598 (458 SE2d 833) (1995).

CARLEY, Presiding Justice, concurring specially.

I concur fully in the majority's affirmance of the convictions and death sentences. I also concur in the majority's opinion with the exception of Division 9 (b), which I cannot join because I do not believe that there was any error whatsoever in the giving of the modified *Allen* charge. See *Allen v. United States*, 164 U. S. 492, 501 (9) (17 SC 154, 41 LE 528) (1896). Therefore, I do not join in the overruling of *Legare v. State*, 250 Ga. 875 (302 SE2d 351) (1983) to any extent.

DECIDED MARCH 15, 2010 —
RECONSIDERATION DENIED APRIL 9, 2010.

*Geerdes & Kim, Holly L. Geerdes, Mitchell D. Durham, Jimmy D. Berry, Carl P. Greenberg, Thomas H. Dunn*, for appellant.

*Patrick H. Head, District Attorney, Dana J. Norman, Assistant District Attorney, Thurbert E. Baker, Attorney General, Theresa M. Schiefer, Assistant Attorney General, Richard A. Malone*, for appellee.