FINAL COPY
295 Ga. 412

S14A0551. PORRAS v. THE STATE.

BLACKWELL, Justice.

Louis Alberto Porras was tried by a DeKalb County jury and convicted of murder, as well as two crimes involving the unlawful possession of a firearm, all in connection with the killing of Jameelah Qureshi. Porras appeals, contending that the trial court erred when it charged the jury. We find no harmful error, however, and we affirm.[1]

---

[1] Qureshi was killed on August 15, 2009. A grand jury indicted Porras on September 2, 2009, charging him with one count of malice murder, two counts of felony murder, one count of unlawful possession of a firearm during the commission of a felony, and one count of unlawful possession of a firearm by a first-offender probationer. By the same indictment, the grand jury also charged Amanda Dove as a co-defendant with one count each of malice murder, felony murder, and unlawful possession of a firearm during the commission of a felony. Dove agreed to testify against Porras, and Porras was tried alone, beginning on February 1, 2011. After his trial, Dove pled guilty to several lesser crimes, including accessory to murder after the fact. The jury returned its verdict against Porras on February 15, 2011, finding him guilty on all counts. He was sentenced to imprisonment for life without the possibility of parole for malice murder and a consecutive term of imprisonment for five years for unlawful possession of a firearm during the commission of a felony. The trial court properly entered no judgment of conviction and imposed no sentence for felony murder, see Malcolm v. State, 263 Ga. 369, 371-372 (4) (434 SE2d 479) (1993), and it also merged the crimes involving the unlawful possession of a firearm, although it is not clear to us why the trial court did so. See, e.g., Norton v. State, 293 Ga. 332, 332, n. 1 (745 SE2d 630) (2013). In any event, the merger of the unlawful possession crimes did not harm Porras, and he quite understandably does not complain about that merger on appeal. See Ellis v. State, 292 Ga. 276, 277, n. 1 (736 SE2d 412) (2013). Porras timely filed a motion for new trial on March

1. Viewed in the light most favorable to the verdict, the evidence shows that Porras was infatuated with Qureshi's daughter. Porras began to see her daughter in August 2005, when the girl was only fourteen years of age.[2] By November 2005, their relationship was a sexual one, and when Qureshi learned of its sexual nature, she reported it to law enforcement officials. As a result, Porras was charged with statutory rape, he eventually pleaded guilty, and in January 2008, he was sentenced to probation for eight years as a first offender.[3] As a condition of his probation, Porras was forbidden to have further contact with Qureshi's daughter. Undaunted, however, he continued to pursue her. In May 2009, Qureshi learned that Porras still was seeing her daughter, and she confronted Porras. In the course of that confrontation, Qureshi told Porras again to stay away from her daughter, and if he did not, Qureshi warned, "I'll kill you." At that point, her daughter attempted to end her relationship with Porras, but even then, Porras continued to seek her affection.

---

7, 2011, and he amended it on February 20, 2013. The trial court denied his motion on July 22, 2013, and Porras timely filed a notice of appeal on August 2, 2013. The case was docketed in this Court for the January 2014 term and submitted for decision on the briefs.

[2] At that time, Porras was twenty years of age.

[3] See generally OCGA § 42-8-60.

2

As Qureshi returned to her home in Lithonia on the afternoon of August 15, 2009, she was ambushed in her driveway by Porras, who was dressed as a woman and armed with two guns. Porras fired multiple shots at Qureshi, who sustained at least thirteen gunshot wounds, which proved fatal. A witness saw a distinctive green Dodge pickup truck[4] — like the one that Porras drove — speeding away from the scene. The next day, Porras appeared at a police station, accompanied by Amanda Dove. Porras and Dove met with investigators, and both said that they had been at an apartment in Social Circle — visiting Sherwonda Smith, a friend of Dove — at the time of the shooting.

A few days later, investigators met again with Dove, and they asked her to give another statement. She did so, and this time, she implicated Porras in the shooting. On the day of the shooting, Dove explained, she had been visiting with Smith at the apartment in Social Circle. But that afternoon, Porras came to the apartment, and he and Dove left together in his green pickup truck. Porras and Dove drove to Lithonia, and they stopped at the entrance of the neighborhood in which Qureshi lived. At that point, Dove said, Porras pulled several items

---

[4] The truck was distinctive to the witness because it had "nothing imprinted on the tailgate."

3

from a bag — women's clothing, a shoulder-length black wig, and a gun — disguised himself as a woman, and instructed Dove to drive the truck toward the Qureshi home. When they saw Qureshi pull into her driveway, Porras exited the truck, approached Qureshi, and shot her several times. According to Dove, she and Porras then returned to the apartment in Social Circle. The day after the shooting, Dove said, Porras asked her to accompany him to the police station and help him fabricate an alibi.

Based on the new statement from Dove, investigators obtained a warrant and searched the home in which Porras lived. There, in the tank of a toilet, they found handwritten scripts, which evidently were to be used to place calls to the "Crime Stoppers" hotline and to the DeKalb County Police Department. The scripts — apparently intended to be used by a female caller who would claim responsibility for killing Qureshi — contained information about the shooting that had not been released to the public. Also in the home, investigators found a card for a prepaid cellular telephone, and on the card, someone had written a phone number for the DeKalb County Police Department.

At trial, the prosecution offered considerable evidence about motive, and Dove testified and shared her eyewitness account of the shooting. Her testimony

4

was corroborated in several respects by Smith, who confirmed that Porras came to her apartment on the afternoon of August 15, that he and Dove left together, and that they later returned together. Smith also testified that Porras was wearing a blue bandana when he came to her apartment, but he was not wearing it when he returned. A bandana had been found by investigators near the scene of the shooting, and Smith said that it resembled the bandana that Porras was wearing. Finally, Smith testified that, on the day after the shooting, Dove asked her to accompany Porras to the police station, and Dove specifically asked Smith to tell investigators that the three of them were at Smith's apartment on the afternoon of the shooting, but Smith refused to do so.

Porras does not dispute that the evidence is sufficient to sustain his convictions. Nevertheless, consistent with our usual practice in murder cases, we have reviewed the evidence and considered its legal sufficiency. We now conclude that the evidence adduced at trial was sufficient to authorize a rational trier of fact to find beyond a reasonable doubt that Porras was guilty of the crimes of which he was convicted. See Jackson v. Virginia, 443 U. S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979).

2. Porras contends that the trial court erred when it charged the jury on the various ways in which a witness can be impeached. About impeachment, the trial court charged, in relevant part:

> To impeach a witness is to prove that a witness is unworthy of belief. Now, a witness may be impeached by disproving the facts to which the witness has testified; proof that the witness has been convicted of a crime involving dishonesty or making a false statement; proof of contradictory statements previously made by the witness about matters relevant to the witness's testimony and to the case.

The trial court failed, however, to charge that a witness also may be impeached by proof that the witness has been convicted of a felony, regardless of whether the felony involved dishonesty or a false statement. At trial, the prosecution called three "jailhouse informants" as witnesses, and proof was offered that two of these witnesses had prior felony convictions, but not convictions involving dishonesty or false statements. Porras requested a charge on impeachment by proof of a prior felony conviction, and he timely objected when the trial court failed to give such a charge. In these circumstances, it was error for the trial court to fail to charge that a witness may be impeached by proof of a prior felony conviction. See Sapp v. State, 271 Ga. 446, 448 (2) (520 SE2d 462) (1999). But such an error sometimes may be harmless, and it is no basis for

6

reversal if it is highly probable that the error did not contribute to the verdict. McIntyre v. State, 266 Ga. 7, 10 (4) (463 SE2d 476) (1995). We turn, therefore, to the question of harm.

The most important evidence against Porras was the testimony about his motive to kill Qureshi, the eyewitness testimony of Dove, and the corroborating testimony of Smith. As we noted earlier, two prosecution witnesses were subject to impeachment by proof of a prior felony conviction, but neither could be fairly characterized as a critical witness. Cf. Wakefield v. State, 261 Ga. App. 474, 476 (1) (583 SE2d 155) (2003) ("[I]t is reversible error for a trial judge to fail to charge the jury on impeachment by prior felony conviction when the witness involved presents the state's principal testimony against the defendant."). Moreover, the defense urged by Porras at trial — an alternative account of the shooting, in which Dove shot Qureshi, motivated by a jealousy of her daughter — was disproved not so much by the testimony of these two impeachable witnesses, but by the testimony of Dove and Smith, which the jury obviously found credible, as well as the incriminating scripts found by investigators when they searched Porras's home.

Equally important, considering the nature of the evidence offered through the two witnesses with prior felony convictions, it is difficult to believe that any rational jury would have considered them credible witnesses, even in the absence of a charge that they might be impeached by their prior felony convictions, or that their impeachment by prior felony convictions would have been of much help to Porras. The first of these witnesses, Asmar Scott, was called as a witness by the prosecution, but he testified that he "kn[e]w nothing" about Porras. The prosecuting attorney then asked Scott about his numerous felony convictions, introduced evidence of those convictions, and accused Scott of being untruthful. The prosecuting attorney also tendered a prior statement, written out by a police officer, but attributed to Scott, in which Scott allegedly reported that a fellow inmate in the jail — Porras, the State claimed — had confessed to a killing. According to the written statement, "a Latino guy who called himself 'BK'" claimed at first to have shot "a cop," but later admitted to Scott that he shot "the mother of his fianc[é]e," and "BK" admitted as well that he owned two specific kinds of guns, although other evidence at trial showed that neither of these specific kinds of guns were used to kill Qureshi. In court, however, Scott denied the prior statement altogether, testifying that he never had

8

said the things attributed to him in the written statement. On cross-examination, Porras elicited testimony that Scott had attended college, that he was perfectly capable of writing his own statement, and that he would have had no need for a police officer to write out a statement for his signature. Scott also opined, from his own experience, that it is common for police officers to falsely attribute statements to people in jail. In addition, Scott admitted on cross-examination that he did make some oral statements to police about Porras (although not the ones attributed to him in the written statement), that in his oral statements, he was "just making it up" based on public information so that he could get favorable treatment in his own pending prosecution, and that the district attorney had, in fact, dropped one of the charges against Scott. Perhaps because the testimony offered by Scott in court — as opposed to the prior statement attributed to him — was helpful to Porras, Porras made no mention of his prior felony convictions on cross-examination.

The second witness at issue, Ricky Crowder, had informed the prosecuting attorney that he would refuse to testify. When the prosecution called him anyway, the prosecuting attorney asked him about his numerous felony convictions (which dated back to 1977) and elicited testimony that his criminal

9

history was 46 pages in length. The prosecution treated Crowder as a hostile witness, and it introduced a certified copy of his most recent felony conviction, as well as a written statement signed by Crowder, which described a confession in the jail. According to the statement, "a Mexican with . . . a lot of tattoos on his neck, arms, and legs and maybe blonde hair" admitted that he had been charged with child molestation "8-9 years ago," that the mother of the molestation victim "hadn't ever liked him since," that he and his co-defendant were "on meth and ecstasy" on "the night [the killing] happened," that two handguns were used but the police had recovered neither, and that the "Mexican" knew that he would be acquitted because the "detectives didn't take gunpowder residue tests when he got arrested." Other evidence at trial showed, however, that Porras had been convicted of statutory rape only about three years before his murder trial, that the killing had occurred in the afternoon, not at night, and that, although Porras had some tattoos, he had none upon his neck, arms, or legs. And in any event, although Crowder at trial acknowledged his signature on the written statement, he testified that he did not remember Porras saying anything about his case and did not know what was written in the

10

statement that he signed. As with Scott, Porras asked Crowder nothing about his prior convictions on cross-examination.

Although the trial court erroneously failed to charge that a witness can be impeached by proof of a prior felony conviction, the trial court did instruct the jury on credibility generally, charging in pertinent part:

> You must determine the credibility or believability of the witnesses. It is for you to determine which witness or witnesses you believe or do not believe, if there are some whom you do not believe. In deciding on credibility, you may consider all the facts and circumstances of the case, the manner in which the witnesses testify, their interest or lack of interest in the case, their means and opportunity for knowing facts to which they testify, the nature of the facts about which they testify, the probability or improbability of their testimony, and the occurrences about which they testify. You may also consider their personal credibility — their personal credibility insofar as it may have been shown in your presence, or by the evidence.

About interest in the case, the trial court also explained that the jury could consider "any possible motive [of the witness] in testifying," including "any possible pending prosecutions, if any." Scott and Crowder, of course, had their own pending prosecutions, and Scott spoke openly at trial about his desire to curry favor with the State by providing information about Porras. About "the nature of the facts about which they testify" and "the probability or

improbability of their testimony," we note that the confessions described in the prior written statements that were attributed to Scott and Crowder were inconsistent in many respects with other evidence about Porras and the circumstances of the crimes of which he was convicted. And with respect to the "personal credibility [of witnesses] insofar as it may have been shown in your presence, or by the evidence," it is difficult to believe that a rational jury would not question, for instance, the credibility of a jailhouse informant with a 46-page criminal history dating back more than 30 years, even in the absence of an explicit charge about impeachment by a prior felony conviction.

In any event, Scott and Crowder were hurtful to Porras only to the extent that the jury accepted the prior statements attributed to them, and if the jury, in fact, accepted those prior statements, the jury could not possibly have concluded that Scott and Crowder generally were credible and trustworthy men, insofar as both explicitly disavowed those statements at trial. Put another way, if the jury believed Scott and Crowder were worthy of belief, then the jury would have disregarded their prior inconsistent statements — which they denied at trial were their statements at all — and the failure to charge on impeachment by prior felony convictions could not have harmed Porras. If the jury disbelieved Scott

12

and Crowder altogether — both their trial testimony and the content of their earlier statements — the failure to charge fully on impeachment likewise could not have harmed Porras. And if the jury disbelieved Scott and Crowder in their trial testimony — but credited their earlier statements — it is difficult to understand how a charge on impeachment by a prior felony conviction would have changed the thinking of the jury at all. Considering all these circumstances, we conclude that it is highly probable that the failure of the trial court to charge on impeachment by a prior felony conviction did not contribute to the verdict of the jury in this case.[5] See Brown v. State, 289 Ga. 259, 261 (2) (710 SE2d 751) (2011).

---

[5] We have considered that the jury was recharged on impeachment — like its earlier charge on impeachment, the trial court failed in its recharge to instruct on impeachment by a prior felony conviction — late in its extended deliberations and shortly before it returned a verdict. This circumstance, Porras says, shows harm. But at that point in the deliberations, the jury asked not only for a recharge on impeachment, but also for recharges on "the definition of reasonable doubt," circumstantial evidence, and the authority of the jury to compare physical evidence and to draw conclusions therefrom. That a verdict followed soon after the recharge on impeachment, therefore, does not show that the verdict was driven by that recharge. Moreover, when the jury asked for a recharge on impeachment, it asked only for "the definition of an impeached witness," which may or may not refer to the methods by which a witness may be impeached. And in any event, nothing about the jury request for a recharge indicates that the jurors were especially concerned with Scott and Crowder, as opposed to the several other witnesses – particularly Dove and Smith – who arguably had been impeached on assorted grounds. Given all of the other circumstances, the late request for a recharge on impeachment does not alter our conclusion that it is highly probable that the error in charging on impeachment did not contribute to the verdict.

13

3. Porras also contends that the trial court coerced a verdict by improperly charging the jury about its obligation to return a unanimous verdict. In all, the jury in this case deliberated for about eighteen hours over the course of four days. The deliberations commenced on the afternoon of Thursday, February 10, 2011, but the trial court sent the jury home after only about two hours because a juror was sick. The jury returned the next morning, and after it deliberated for about three more hours, it reported early on Friday afternoon that it was deadlocked.[6] With the consent of both the prosecuting attorney and defense counsel, the trial court directed the bailiff at that time to tell the jury to continue its deliberations. Not quite two hours later, also on Friday afternoon, the jury reported that it remained at a "standstill." At that point, the trial court brought the jury back to the courtroom and charged:

> Let me point out that this case has been on trial, if you include jury selection, for over a week, and you have just gotten the case as of yesterday afternoon. There are many, many issues that have to be discussed. And, of course, it is an extraordinarily important case. I am not going to excuse the jury today on this case. We will deliberate until we get a decision, if that's what you are supposed to do. I am going to let you retire to the jury room until 4:30, and assuming you have not arrived at a verdict, I will then allow the

---

[6] At this point, the jury reported that it was deadlocked "11 to 1," but it did not indicate which way it was leaning.

14

bailiff to excuse you, and you will be required to report back next Monday at 9:00 to continue with your deliberations.

Porras argues that this charge was coercive, but he did not object to it at the time.

The jury deliberated for approximately another hour on Friday, and it then was excused for the weekend. On the following Monday, the jury resumed its deliberations. Early on Monday afternoon, the jury reported that, "[a]fter careful deliberation, we are still 11 to 1 on convicting [Porras] as guilty. We agree that this won't change." At that point, although the jury was in its third day of deliberations, it had only deliberated for about twelve hours in all. Over the objection of Porras, the trial court then gave an <u>Allen</u> charge,[7] and the jury continued its deliberations. A couple of hours later, the trial court excused the jury for the day and directed the jury to return on Tuesday. As it excused the jury on Monday afternoon, the trial court said, "[t]he length of the deliberations will be dependent upon you, as you have been selected for the purpose of arriving at a verdict, and that's what I expect." Porras also contends that this final remark on Monday afternoon was coercive, but again, he did not make a timely objection.

---

[7] See <u>Allen v. United States</u>, 164 U. S. 492 (17 SCt 154, 41 LE 528) (1896).

15

The jury returned on Tuesday morning, and it deliberated until early afternoon, when it asked several questions of the trial court. In response to these questions, the trial court gave a recharge on several subjects, see note 5, supra, and the jury reached a unanimous verdict soon thereafter. At the request of Porras, the trial court polled the jury, and each juror confirmed the verdict.

When a defendant claims that the trial court coerced a verdict by its charge, we look to the totality of the circumstances, and we consider whether the charge was "coercive so as to cause a juror to abandon an honest conviction for reasons other than those based upon the trial or the arguments of other jurors." McMillan v. State, 253 Ga. 520, 523 (4) (322 SE2d 278) (1984). See also Sears v. State, 270 Ga. 834, 837 (1) (514 SE2d 426) (1999). Here, the first charge about which Porras complains did nothing more than inform the jury that, despite its perception of a "standstill," the trial court would not discharge the jury on its first full day of deliberations, but the court instead would require the jury to continue its deliberations on the next business day. As for the second charge about which Porras complains, although the trial court suggested that it "expect[ed]" a verdict, this brief remark was made within a couple of hours of the Allen charge, and most certainly, the jury would have taken it in the context

16

of that earlier and more extensive charge. As a part of the Allen charge, the trial court explicitly and repeatedly told the jury that a verdict was expected only "if possible," that jurors were not to acquiesce simply to reach a verdict, that, if the jurors continued to have divergent views of the case, all of the jurors (not just the juror in the minority) should "scrutinize the evidence more closely and . . . reexamine the grounds of their opinion," and that the jury would be required to deliberate only for "a reasonable time . . . to try to arrive at a verdict." At no point did the trial court say or imply that any juror should abandon her honest convictions about the case, nor did the trial court comment on the evidence or express an opinion about whether Porras was guilty. Compare McMillan, 253 Ga. at 523 (4) (instruction was unduly coercive where — in trial in which evidence was presented only by the prosecution — trial court said that "I feel like there is enough evidence in this case for you to reach a verdict one way or the other"). To the extent that Porras argues that the charges were coercive simply because they compelled the jury to continue deliberating after it reported a deadlock, the trial court was not bound to accept the jury's pronouncement of a deadlock, and the trial court instead was "required to make its own determination as to whether further deliberations were in order." Sears, 270 Ga.

17

at 838 (1) (citation omitted). That the jurors individually confirmed their verdict when polled also suggests that the charges were not coercive. See Burchette v. State, 278 Ga. 1, 3 (596 SE2d 162) (2004). Considering the totality of the circumstances, we conclude that, even if Porras had made timely objections to the charges he now contends were coercive, the objections would have been without merit.[8] See Porter v. State, 278 Ga. 694, 696 (2) (606 SE2d 240) (2004). See also Gamble v. State, 291 Ga. 581, 584 (5) (731 SE2d 758) (2012).

Judgment affirmed. All the Justices concur.

Decided June 30, 2014.

Murder. DeKalb Superior Court. Before Judge Seeliger.

Steven E. Phillips, for appellant.

Robert D. James, Jr., District Attorney, Anna G. Cross, Leonora Grant, Assistant District Attorneys, Samuel S. Olens, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Christian A. Fuller, Assistant Attorney General, for appellee.

---

[8] Porras claims that his trial lawyer was ineffective because he failed to object to the charges about which Porras now complains, but "the failure to make a meritless objection cannot amount to ineffective assistance." Bradley v. State, 292 Ga. 607, 614 (5) (740 SE2d 100) (2013).