302 Ga. 717
FINAL COPY

S17A1757.  SMITH v. THE STATE.

H<small>INES</small>, Chief Justice.

Following the denial of his motion for new trial, as amended, Herman Smith appeals his convictions for felony murder while in the commission of aggravated assault, aggravated assault with a deadly weapon, two counts of possession of a firearm during the commission of a felony, and carrying a weapon without a license, all in connection with the fatal shooting of Cardarius Steagall and an assault upon Chaserah Horton.  Smith challenges the trial court's refusal to grant a mistrial and two evidentiary rulings.  Finding the challenges to be unavailing, we affirm.[1]

---

[1] The crimes occurred on November 18, 2012.  On June 18, 2013, a Carroll County grand jury indicted Smith for malice murder, felony murder while in the commission of the aggravated assault of Steagall, the aggravated assault of Steagall with a deadly weapon, two counts of the aggravated assault of Horton with a deadly weapon, two counts of possession of a firearm during the commission of a felony, and carrying a weapon without a license.  He was tried before a jury July 29-August 6, 2013, and found not guilty of malice murder and one count of the aggravated assault of Horton, but guilty of all other charges.  On August 22, 2013, Smith was sentenced to life in prison for felony murder, a concurrent term of twenty years in prison for the other count of aggravated assault of Horton, consecutive terms of five

1. Construed to support the verdicts, the evidence showed the following. On November 18, 2012, at approximately 2:30 a.m., police responded to a nightclub where they found Steagall dead on the floor. Next to the body, the officers discovered a .22 caliber revolver, with one empty shell casing and two live bullets in it. The spent shell casing was the final round in the cylinder, and the trigger would have to be pulled five times for the next live round to fire. Officers also recovered four .45 caliber shell casings and two .45 caliber bullets from the crime scene, and a third .45 caliber bullet from Steagall's body during the autopsy. The cause of death was determined to be three gunshot wounds to the neck, head, and chest, which were consistent with a large caliber gun being fired from some distance away.

Later on the day of the shooting, investigators interviewed Smith, who admitted that he was at the nightclub when Steagall was shot. Smith also stated

years in prison for each count of possession of a firearm during the commission of a felony, and a concurrent term of twelve months in prison for carrying a weapon without a license; the remaining count of aggravated assault upon Steagall merged with the felony murder for the purpose of sentencing. Trial counsel filed a motion for new trial on Smith's behalf on August 26, 2013, and the motion was amended by new counsel on July 25, 2014. The motion for new trial, as amended, was denied on March 15, 2017. A notice of appeal was filed on April 12, 2017, and the case was docketed in this Court for the August 2017 term. The appeal was submitted for decision on the briefs.

that he had used cocaine, a street drug he called "Molly," and alcohol the previous night and that the whole night was a "blur." Smith said that he had heard a single gunshot and ran from the building. During a second interview on December 6, 2012, Smith claimed that Steagall had brandished a weapon, causing Smith to fire in self-defense.

At trial, witnesses called by the State testified that Steagall was not holding a gun when he was shot. Horton testified that he was next to Steagall, that he heard three shots, that he thought for a moment that he had been shot, and that he saw Steagall fall and did not see him with a gun. Horton also testified that he made eye contact with the shooter, whom he positively identified as Smith, and saw him put the gun away. Witnesses called by Smith, however, testified that, at various times during the night, they had seen Steagall with a gun.

Smith does not contest the legal sufficiency of the evidence supporting his convictions. Nevertheless, as is this Court's practice in murder cases, we have reviewed the record and conclude that, when viewed in the light most favorable to the verdicts, the evidence presented at trial was sufficient to authorize a rational trier of fact to find Smith guilty beyond a reasonable doubt of the crimes

3

for which he was convicted. See *Jackson v. Virginia*, 443 U. S. 307 (99 SCt 2781, 61 LE2d 560) (1979).

2. Smith contends that the trial court erred by refusing to grant motions for mistrial he made during jury deliberations on the ground that notes from the jury showed that it was hopelessly deadlocked. Instead of declaring a mistrial, the trial court instructed the jury several times to continue deliberations, and the court eventually gave a modified *Allen* charge. See *Allen v. United States*, 164 U. S. 492 (17 SCt 154, 41 LE 528) (1896). These actions, Smith complains, coerced a holdout juror into changing his or her vote. However, the trial court's determination of whether the jury was hopelessly deadlocked "will be reversed on appeal only for an abuse of . . . discretion," *Humphreys v. State*, 287 Ga. 63, 78-79 (8) (b) (694 SE2d 316) (2010), and "[w]hether a verdict was reached as the result of coercion depends upon the totality of the circumstances." *Sears v. State*, 270 Ga. 834, 837 (1) (514 SE2d 426) (1999). Accordingly, we will now review the totality of the circumstances surrounding Smith's motions for mistrial and the trial court's actions during deliberations.

Early in the jury's deliberations, which began at 1:30 p.m. on Monday, August 5, 2013, the jurors sent various notes to the trial court containing

4

requests for certain exhibits and asking questions about the evidence and the law. These were followed late Monday afternoon and Tuesday by a number of notes from the jury regarding its deliberations. The first of these notes said, "What happens if the jury vote is at 11 guilty and one not guilty on count one and count two?"[2] At 6:00 p.m. that Monday, the jury was instructed to keep deliberating. About an hour later, the jury sent another note reading, "We are in stalemate on counts one and two. The vote is currently ten guilty two not guilty." Smith moved for a mistrial, and the State requested an *Allen* charge. The judge denied both, and the court went into recess for the night. The next day, the jury returned at 9:00 a.m. and later wrote the following:

> We continue to deliberate count one and count two. There are still ten guilty and two not guilty. One not guilty is reviewing the evidence, and one refuses to change her vote. The ten guilty votes agree to compromise for count one not guilty for a unanimous guilty verdict on count two. Would you like for us to continue to deliberate?[3]

---

[2] Count 1 of the indictment charged malice murder, while Count 2 charged felony murder while in the commission of aggravated assault.

[3] Smith does not raise any claim of error based on the possibility that the jury may have negotiated and reached a "compromise" verdict.

5

Smith again moved for a mistrial, and the State again requested an *Allen* charge. At 9:55 a.m., the judge denied both and instructed the jury to continue deliberating. A subsequent note from the jury stated, "We have continued to deliberate and review the evidence. There are still two not guilty votes on counts one and two. There is one not guilty that is still reviewing the evidence. The other not guilty will not waiver [sic] and has not and is not willing to review the evidence." Smith again moved for a mistrial, and the State requested that the alternate juror be substituted for the juror refusing to deliberate or, in the alternative, that an *Allen* charge be given. The judge denied these requests and, at 11:00 a.m., instructed the jurors to continue to deliberate. A later note from the jury read, "Are there suggestions from the Court on how to continue deliberations? We have still got the same dilemma." Smith, once more, requested a mistrial, which was denied.

After lunch, the foreperson, at her request, was brought into the courtroom, and she stated, "We still have one that's continuing to read the evidence, but we have one juror that refuses to review the evidence, the indictment, the instructions. So I'm looking for guidance from the Court on how to get past that stalemate." In response to questions from the court, the

6

foreperson stated that all 12 jurors had participated in the deliberations at the start and continued for a period of time. When the foreperson was excused, Smith moved for a mistrial, and the court denied it and instructed the jurors to resume their deliberations. The next note from the jury read, "Deliberations continue. Count one is guilty three, not guilty nine. Count two is guilty 11, not guilty one. The compromise during deliberation from foreperson was for each person to reconsider based on evidence. One juror continues to refuse to participate." Smith moved for a mistrial, noting that the jury had deliberated for close to ten hours, and the State requested an *Allen* charge. The judge denied both requests and instructed the jury to keep deliberating. Another note from the jury read, "The vote remains count one not guilty, nine[;] guilty, three. Count two 11 guilty, one not guilty." The court permitted the jury to take a break and resume its deliberations upon returning. Thereafter, the jury sent a note saying, "Deliberations continue. Current jury vote, count one, one guilty, 11 not guilty. Count two, 11 guilty, one not guilty. Each of the number one on both counts that are making the votes non-unanimous are visibly not willing to change their vote." Once again, Smith moved for a mistrial. The judge denied it and instructed the jury to keep deliberating.

7

At 3:20 p.m., another note from the jury stated, "We have the one guilty count on count one willing to change their vote to not guilty if the juror that's voting not guilty on count two will change their vote to guilty. The juror with the not guilty remains unchanged. Suggestions?" The State again requested an *Allen* charge. The court decided not to give the pattern charge but, over Smith's objection, did administer an *Allen*-like charge drawn from ABA Standard for Criminal Justice 15-5.4 (3d ed. 1996) (formerly 15-4.4).[4] The jury subsequently sent a note requesting use of an empty room with similar dimensions to the crime scene for a re-enactment. After consulting with counsel for both parties, the trial court permitted the jurors to use the jury assembly room and granted their additional request for a tape measure. At 7:30 p.m., the jury returned its

---

[4] That charge, as administered by the court, reads as follows:
The verdict must represent the considered judgment of each juror. In order to return a verdict, it is necessary that each juror agree thereto. Your verdict must be unanimous. It is your duty as jurors to consult with one another and to deliberate with a view to reaching an agreement if you can do so without violence to individual judgment. Each of you must decide the case for yourself, but do so only after an impartial consideration of the evidence with your fellow jurors. In the course of your deliberations, do not hesitate to re-examine your own views, and change your opinion if convinced it is erroneous, but do not surrender your honest conviction as to the weight or effect of evidence solely because of the opinion of your fellow jurors or for the mere purpose of returning a verdict. You are not partisans. Your sole interest is to ascertain the truth from the evidence in the case.

verdicts, confirmed by a jury poll, finding Smith not guilty of malice murder and one count of aggravated assault upon Horton, but guilty of the other charges. See footnote 1, supra.

As this review demonstrates, the jury did not simply announce that it was "deadlocked." Rather, the jury reported its numerical division and the lack of continued participation by one juror, solicited suggestions and guidance from the court, and described its position with the terms "stalemate" and "dilemma." Even assuming that the jury had more strongly described itself as "hopelessly deadlocked" or some equivalent description, "the trial court was not bound by those pronouncements. On the contrary, the trial court, in the exercise of a sound discretion, was required to make its own determination as to whether further deliberations were in order." *Sears*, 270 Ga. at 838 (1). See also *Porras v. State*, 295 Ga. 412, 420 (3) (761 SE2d 6) (2014) (trial court's instructions were not "coercive simply because they compelled the jury to continue deliberating after it reported a deadlock"). That determination is a "sensitive" one "best made by the trial court that has observed the trial and the jury." *Humphreys*, 287 Ga. at 78 (8) (b). Factors in determining whether requiring further deliberations was coercive include the length of trial, the length of

9

deliberations before the jury indicates that it is deadlocked, the language of the jury's notes, the progress of the jury, the language of the *Allen* charge and other instructions regarding deliberations, the length of additional deliberations after the alleged coercion, whether the jury found the defendant not guilty of any charges, and the polling of the jury.[5] See *Drayton v. State*, 297 Ga. 743, 749 (2) (b) (778 SE2d 179) (2015); *Porras*, 295 Ga. at 420 (3); *Sharpe v. State*, 288 Ga. 565, 568 (5) (707 SE2d 338) (2011); *Humphreys*, 287 Ga. at 79 (8) (b); *Sears*, 270 Ga. at 837-838 (1); *Romine v. State*, 256 Ga. 521, 525-526 (1) (c) (350 SE2d 446) (1986).

In the case at bar, the trial lasted nearly a week,[6] and the jury deliberated only one afternoon before first indicating that it was in "stalemate." The jury was quite communicative, having submitted a number of questions to the court unrelated to deliberations, and the jury began regularly updating the court on the

---

[5] The ABA Standard for Criminal Justice 15-5.4 cmt. (3d ed. 1996) states that the conditions under which a jury is forced to deliberate are often the key factor. Examples given by that commentary include sleep deprivation and a threat to keep the jurors together for an unreasonable or indefinite period of time until they agree on a verdict. We note, however, that there is no indication in this case of that kind of difficult condition for deliberations.

[6] The jury was selected on Tuesday, July 30, 2013, the presentation of evidence began on Wednesday morning, July 31, and the trial court completed its charge to the jury at 1:30 p.m. on Monday, August 5.

progress of its deliberations. The trial court learned, without inquiring of the jurors, that a majority of them were voting guilty on at least one murder count, but that circumstance does not demonstrate error "since the jury volunteered this information without prompting by the judge." *Jones v. State*, 273 Ga. 231, 234 (5) (539 SE2d 154) (2000). Nevertheless, it would have been much better for the trial court to tell the jurors to stop revealing the nature of their numerical division, as well as the content of their deliberations, and we again encourage trial judges "to inform jurors not to reveal that information." *Sears*, 270 Ga. at 839 (1), n. 1. After the jury first broached the subject of its numerical division late in the day on Monday, it repeatedly reported continuing progress, consisting of review of the evidence and shifting votes on the murder counts. Although the jury posed a question in hypothetical form late Monday regarding a split vote of eleven to one, and although the jury began expressing concern Tuesday morning that one of its members was no longer participating, it was not until Tuesday afternoon that the jury reported that only one juror's vote on both murder counts was different from all the other jurors.

The modified *Allen* charge that the trial court gave in the middle of the afternoon on Tuesday used the language from the ABA Standards for Criminal

11

Justice that this Court approved as "fair and accurate" in *Romine*, 256 Ga. at 527 (1) (d), and that has been recognized as less potentially coercive than the more typical *Allen* charge. See ABA Standard for Criminal Justice 15-5.4 cmt. (3d ed. 1996); Wayne F. Foster, Annotation, Instructions Urging Dissenting Jurors in State Criminal Case to Give Due Consideration to Opinion of Majority, 97 ALR3d 96, § 2 [a] (1980). Cf. Suggested Pattern Jury Instructions, Vol. II: Criminal Cases § 1.70.70 (4th ed. 2007). As for the trial court's prior instructions directing the jury to continue deliberations, their sheer number was problematic, potentially having some coercive effect. But the simple content of those instructions was not coercive. "They did not put pressure on the jurors one way or the other; they did not exhort the minority to reexamine its views in deference to the majority, or . . . suggest that the majority's position is correct." *Sears*, 270 Ga. at 838 (1) (citations and punctuation omitted). See also 6 Wayne R. LaFave et al., Criminal Procedure § 24.9 (d) (4th ed. Dec. 2016 update) ("Except in a few states where statutes limit the number of times a judge may order a jury to renew deliberations, the rule is that the judge may send the jury back for further deliberations once, twice or several times." (footnote omitted)); Standard for Criminal Justice 15-5.4 cmt. (3d ed. 1996) ("[t]he general view is

that a court may send the jury back for additional deliberations even though the jury has indicated once, twice, or several times that it cannot agree").

After those instructions and the modified *Allen* charge, the jury decided to review the evidence again in a different way, asking for a room suitable for a re-enactment, and then spent a few additional hours of deliberation before returning unanimous verdicts, including verdicts of not guilty on two of the most serious charges. Moreover, the jurors were polled and individually confirmed their verdicts. Considering the totality of these circumstances, we conclude that the trial court's actions did not coerce the jury's verdicts. See *Drayton*, 297 Ga. at 749 (2) (b); *Porras*, 295 Ga. at 420 (3); *Sharpe*, 288 Ga. at 568 (5); *Humphreys*, 287 Ga. at 79 (8) (b); *Sears*, 270 Ga. at 837-838 (1). And the trial court did not abuse its discretion in refusing to find that the jury was hopelessly deadlocked and denying Smith's motions for mistrial. See *Humphreys*, 287 Ga. at 80 (9) (a); *Romine*, 256 Ga. at 525-526 (1) (c). Cf. *Mason v. State*, 244 Ga. App. 247 (535 SE2d 497) (2000).

3. Smith urges that the trial court erred in admitting an audio recording of a five-minute phone call that Smith made from jail to a friend.[7] During trial, Smith objected to the recording under OCGA § 24-4-403 on the ground that it had little or no probative value and was unfairly prejudicial, confusing, and needlessly cumulative. The trial court overruled the objection. The State argues that this claim is subject only to plain error review because defense counsel stated that he had "no objection" when the recording was later tendered. However, pretermitting whether Smith properly preserved this issue for review,[8] we have determined that his claim lacks merit for the following reasons.

Smith argues that during much of his phone call from jail, he made derogatory references to Caucasians ("crackers"), women ("bitches"), and police officers ("pigs") that were highly prejudicial, serving only to inflame the passions of the jury against him. That prejudicial effect, Smith asserts,

[7] The entire recording was played for the jury, except for brief references to Smith as "Hit Man" at the very beginning of the phone call. See *Carroll v. State*, 261 Ga. 553, 554 (2) (408 SE2d 412) (1991).

[8] We note that, as the State argued, if defense counsel's statement of "no objection" did amount to a forfeiture of ordinary appellate review, we still would review admission of the evidence in question for plain error under OCGA § 24-1-103 (d), see *Crayton v. State*, 298 Ga. 792, 799 (5) (784 SE2d 343) (2016).

14

substantially outweighed the probative value of the audio recording, as the only arguably relevant portions of the phone call were his denials that he committed any crimes, and those denials were cumulative of his initial statement to police and thus barely probative at best. "Generally, '[a]ll relevant evidence shall be admissible,' OCGA § 24-4-402." *Davis v. State*, 301 Ga. 397, 399 (2) (801 SE2d 897) (2017). Under OCGA § 24-4-403, however, "[r]elevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." "The application of [OCGA § 24-4-403] is a matter committed principally to the discretion of the trial courts, and as we have explained before, the exclusion of relevant evidence under [OCGA § 24-4-403] is an extraordinary remedy that should be used only sparingly." *Plez v. State*, 300 Ga. 505, 507-508 (3) (796 SE2d 704) (2017).

We have carefully reviewed the audio recording. Although parts of it are difficult to understand, it is clear that Smith said he "didn't do it," that he denied the existence of any evidence against him, and that he did not claim self-defense at that time. Thus, the recording showed that Smith made statements that were

15

not consistent with either his statements at his second police interview or the defense theory of justification presented at trial. "Certainly, the relevance of defendant's own statements about the crime cannot be disputed." *Carroll v. State*, 261 Ga. 553, 554 (2) (408 SE2d 412) (1991). And the statements at issue were not needlessly cumulative, as they showed that Smith's denials of the crimes were made not only in his first statement to investigators, but also to a friend at a later time, and that he again did not mention self-defense. See *United States v. Cardona-Castillo*, 648 Fed. Appx. 782, 786 (II) (B) (11th Cir. 2016) (a statement is not needlessly cumulative simply because another individual's testimony can prove the same fact). As for the claimed unfair prejudice, the question before us is not whether the telephone call containing the derogatory language was prejudicial, but rather whether the danger of unfair prejudice substantially outweighed the probative value of the recording. See *Anglin v. State*, 302 Ga. 333, 337 (3) (806 SE2d 573) (2017). Unfortunate though it may be, the words that Smith used "have lost much of their shock value in contemporary culture." *State v. Alzaga*, 352 P3d 107, 119 (Utah App. 2015). See also *People v. Edelbacher*, 766 P2d 1, 16 (Cal. 1989) ("[j]urors today are not likely to be shocked by offensive language"). "These words alone were

16

unlikely to induce the jury to return a conviction based on a generalized assessment of character." *Alzaga*, 352 P3d at 119 (citation and punctuation omitted). Accordingly, we cannot say that the derogatory terms used by Smith created a risk of unfair prejudice that substantially outweighed the recording's probative value, and we conclude that the trial court did not abuse its discretion when it performed the balancing required by OCGA § 24-4-403 and admitted the audio recording of Smith's phone call from jail.

4. Finally, Smith contends that the trial court erred by denying his motion to redact his first statement to police to exclude portions that mention his illicit drug use because those portions involved unrelated criminal acts that constituted irrelevant character evidence. As we recently recognized, "[t]he limitations and prohibition on 'other acts' evidence set out in OCGA § 24-4-404 (b) do not apply to 'intrinsic evidence.'"[9] *Williams v. State*, 302 Ga. 474, 485 (IV) (d)

---

[9] Although our new Evidence Code applies to this case, we observe that, under the former Evidence Code, "'evidence as to whether a defendant was under the influence of alcohol or drugs at the time a crime was committed [was] deemed part of the res gestae and [was] admissible as such even though it may [have] incidentally place[d] the defendant's character in evidence.'" *Hamilton v. State*, 295 Ga. 295, 298 (2) (759 SE2d 530) (2014) (quoting *Cunningham v. State*, 279 Ga. 694, 695 (3) (620 SE2d 374) (2005), which held that the trial court did not err in admitting the defendant's un-redacted statement to police because the portions relating to his purchase and use of drugs before the crime were an integral part of his criminal confession).

17

(807 SE2d 350) (2017) (footnote omitted). "Evidence is admissible as intrinsic evidence when it is (1) an uncharged offense arising from the same transaction or series of transactions as the charged offense; (2) necessary to complete the story of the crime; or (3) inextricably intertwined with the evidence regarding the charged offense." Id. (citation and punctuation omitted).

> [E]vidence pertaining to the chain of events explaining the context, motive, and set-up of the crime, is properly admitted if it is linked in time and circumstances with the charged crime, or forms an integral and natural part of an account of the crime, or is necessary to complete the story of the crime for the jury. . . . [E]vidence of other acts is "inextricably intertwined" with the evidence regarding the charged offense if it forms an integral and natural part of the witness's accounts of the circumstances surrounding the offenses for which the defendant was indicted. And this sort of intrinsic evidence remains admissible even if it incidentally places the defendant's character at issue.

Id. (citations and punctuation omitted).

In this case, Smith used his consumption of drugs to explain his condition on the night of the murder, to excuse his partial lack of recollection, and to deny his involvement in the shooting. Therefore, the portions of Smith's initial statement to police that admit his illicit drug use were inextricably intertwined with evidence regarding the charged offenses, as such portions formed an integral and natural part of his account of the circumstances surrounding the

18

offenses for which he was indicted, and the same portions of Smith's first statement were relevant to his defense of justification. Accordingly, we conclude that, although Smith's character may have been incidentally placed into evidence, the trial court did not abuse its discretion in admitting the portions of Smith's statement at issue as intrinsic evidence. See *Williams*, 302 Ga. at 485 (IV) (d); see also *Satterfield v. State*, 339 Ga. App. 15, 19-20 (1) (a) (792 SE2d 451) (2016). Smith also argues that his admissions of illegal drug use were substantially more prejudicial than probative. See OCGA § 24-4-403 (discussed in Division 3, supra). Under the circumstances, however, the probative value of such evidence was not substantially outweighed by the danger of unfair prejudice. See *Williams*, 302 Ga. at 485 (IV) (d); *Sanford v. State*, 284 Ga. 785, 787 (2) (671 SE2d 820) (2009) (prejudicial effect of unredacted portions of the defendant's statements about his intoxication did not outweigh their probative value because they explained his condition at the time of the crime and his inability to remember certain aspects of the events surrounding the crime).

Judgment affirmed. All the Justices concur.

Decided December 11, 2017.

Murder. Carroll Superior Court. Before Judge Simpson.

Michael W. Tarleton, for appellant.

Peter J. Skandalakis, District Attorney, Jeffery W. Hunt, Christopher R. Keegan, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Jason M. Rea, Assistant Attorney General, for appellee.