315 Ga. 598
FINAL COPY

S22A1215.  WHITED v. THE STATE.

BETHEL, Justice.

Justin Lee Whited was convicted of felony murder, aggravated battery, and cruelty to children in the first degree in connection with the death of his seven-week-old daughter, Dinah Whited. On appeal, Whited argues that: (1) the trial court plainly erred by giving a single-witness charge under OCGA § 24-14-8 without also giving a charge on accomplice corroboration; and (2) the trial court abused its discretion by denying Whited's motion in limine under OCGA § 24-4-403 to exclude from evidence a recording of a phone call in which Whited discussed the decision to remove his daughter from life support.[1] For the reasons that follow, we affirm.

---

[1] Dinah was brought to the hospital on April 23, 2016, and she died on August 8, 2016, after being removed from life support. On November 30, 2016, a Walton County grand jury indicted Whited for malice murder (Count 1), two counts of felony murder (Counts 2 and 3), aggravated battery (Count 4), and two counts of cruelty to children in the first degree, which were based on

1. The evidence presented at trial showed the following.[2] On the night of April 22, 2016, Whited and his wife, Jamie Whited, left their children with Jamie's aunt and uncle, Rhonda and Robert Scarborough, while they went to the fair. Whited and Jamie had two children: a two-year-old boy and Dinah. Whited and Jamie picked up both children from the Scarboroughs around 10:30 p.m. Rhonda testified that at that point, Dinah was "fine[,] . . . not in pain or nothing." After Whited and Jamie returned home, they put their son to sleep in his own bed. Dinah slept in the middle of their bed, between Whited and Jamie.

---

separate acts of physical abuse on April 23, 2016 (Counts 5 and 6). At a jury trial held in May 2018, Whited was found guilty of Counts 2, 3, 4, and 5. The jury found Whited not guilty of Count 1 and Count 6. The trial court sentenced Whited to life in prison without the possibility of parole on Count 2 and 20 years in prison on Count 5, to be served concurrently with Count 2. The trial court purported to merge Count 3 with Count 2, but Count 3 was actually vacated by operation of law. See *Noel v. State*, 297 Ga. 698, 700 (2) (777 SE2d 449) (2015). Count 4 merged with Count 2 for sentencing. On May 23, 2018, Whited filed a motion for new trial, which he amended two times through counsel. Following a hearing, the trial court denied the motion, as amended, on May 24, 2022. Whited timely filed a notice of appeal. This case was docketed to this Court's August 2022 term and submitted for a decision on the briefs.

[2] Because this case requires an assessment of whether certain assumed errors by the trial court were harmless, we lay out the evidence in detail and not only in the light most favorable to the jury's verdicts. See *Strong v. State*, 309 Ga. 295, 295 (1) n.2 (845 SE2d 653) (2020).

The next morning, Jamie awoke to Dinah crying and went to the kitchen to make her a bottle. Jamie testified that Dinah had stopped crying before she returned to the bedroom, but when she returned, she realized that Dinah was not breathing normally and was "gasping for breath." At that point, Jamie woke Whited up and said that they needed to take Dinah to the hospital because "[b]abies don't breathe like this."

Whited and Jamie then placed Dinah and their son into the car, and Whited began driving to the hospital. However, they returned home shortly after leaving their driveway to call an ambulance because Dinah was no longer breathing and was "turning blue." As they returned home, Jamie called 911, and Whited began performing CPR on Dinah. Paramedics arrived and transported Dinah to a hospital in Monroe. At that point, Dinah was not breathing on her own and did not have a pulse.

Dinah was ultimately transported via helicopter to a hospital in Atlanta. Medical personnel at the hospital conducted initial x-rays of Dinah, which showed collarbone fractures, shoulder

3

fractures, multiple rib fractures, and bone fractures in both of her legs. Dr. Tamika Bryant, one of Dinah's physicians at the hospital in Atlanta, testified that all of these fractures showed signs of healing at the time the images were taken at the hospital, which indicated that they were sustained prior to that day. Medical personnel also performed a head CT scan on Dinah, which showed a brain injury and bleeding around her brain that had occurred within the 72 hours before her arrival at the hospital. An ophthalmologist at the hospital also observed that Dinah had multiple retinal hemorrhages.

Another of Dinah's physicians at the hospital in Atlanta, Dr. Matthew Paden, testified that Dinah was bleeding so much that they had to "basically completely replace[ ] her entire blood volume" at the hospital through a transfusion. He testified that it would have taken a "tremendous amount of force onto" the veins around Dinah's skull that were bleeding "in order to make them tear" and that her injuries were consistent with a baby who was shaken or received trauma. Dr. Paden noted that a massive injury like Dinah's would

have been "symptomatic almost immediately." While Dr. Paden acknowledged that there are rare medical conditions that could have resulted in Dinah's injuries without any shaking or other trauma, he noted that the hospital tested for those conditions and determined that Dinah did not have them.

Medical personnel performed a new set of x-rays on Dinah on May 14, 2016, which showed additional fractures in both of her legs that were not identified in the prior x-rays. Dr. Bryant testified that she suspected that these additional leg injuries occurred around the same time as the brain injury because they did not show up in the initial x-ray. She also testified that all of Dinah's injuries were consistent with child abuse because normal handling of a seven-week-old does not result in the kind of injuries Dinah suffered. Dr. Bryant also testified that a seven-week-old cannot sustain self-inflicted leg injuries of the sort Dinah experienced because she cannot "walk, run, crawl, or do anything to cause those injuries." A paramedic who responded to the Whited house also testified that Dinah's collarbone fracture could not have been caused by properly

administered CPR from a trained first responder.

Over the next few months, medical personnel conducted several additional tests and found that Dinah had "only the very tiniest of brain function." Dinah was taken off life support on August 4, 2016, and she died on August 8. The GBI medical examiner who performed the autopsy on Dinah testified that the cause of her death was traumatic brain injury.

Jamie testified that she was not aware of Dinah's prior injuries before she learned about them from hospital personnel who had examined Dinah. She testified that she had previously noticed a knot on Dinah's collarbone but noted that she was assured by Dinah's pediatrician, Dr. Holly Hubbard, that there was nothing wrong with Dinah. Dr. Hubbard testified that she examined Dinah but did not obtain x-rays when Jamie brought Dinah in to have her collarbone examined because she "wasn't suspicious of anything." Dr. Paden testified that because injuries in babies do not always show up externally, a pediatrician might not discover a collarbone fracture during an external exam.

When asked about Dinah's collarbone injury at the hospital, Jamie said that her two-year-old son caused the injury when he attempted to crawl on top of Dinah to give her a pacifier while she was in a bouncy seat. But at trial, Jamie testified that the story she gave at the hospital was not true and explained that there was another possible cause of her collarbone injury. Prior to the knot appearing on Dinah's collarbone, there was an incident where Jamie left the bedroom while Whited and Dinah were sleeping and re-entered after hearing Dinah crying to find Dinah with a "knot on her head," Jamie and Whited's son at the foot of the bed, and Whited on the bed with his elbow propped up.[3]

Dr. Hubbard testified that Dinah's injuries could not have been caused by interaction with a two-year-old. She testified that a two-year-old does not "have enough strength or force" to cause a rib fracture and that a two-year-old could not have caused the brain bleeding that Dinah suffered because the brain bleeding was

---

[3] Jamie did not specify how the injury occurred or whether she believed it was Whited or the son who caused Dinah's injuries during this incident.

"caused by shaking, and even though [a two-year-old] could shake a child, it is not with the same force that is required to cause the bleeding in the brain."

Jamie testified that she fabricated the story about her son crawling on top of Dinah on the bouncy chair because she was "worried that someone would get suspicious that [she and Whited] were on drugs" because Whited "had slept so hard while [Dinah] cried" that their son was able to get on top of Dinah without Whited noticing. Jamie also testified that, around the time they came to the hospital, she was detoxing from prescription medication that she was not prescribed, specifically Roxicodone.

Whited was interviewed by a police officer and a social worker at the hospital, and the audio of the interview was played for the jury. During the interview, Whited said the following. Dinah had slept in his and Jamie's bed that night. Jamie went to the kitchen in the morning to make a bottle because Dinah woke up and just "kept crying and crying and crying." While Jamie was in the kitchen, Whited woke up and talked to Dinah in an effort to calm her down

before he went back to sleep. When Jamie came back in, she said that Dinah looked like she was not "breathing right," and Whited told Jamie that Dinah "probably wore herself out [from] crying so hard." But Jamie responded to Whited that "something [didn't] seem right." During the course of the interview, Whited also suggested that their son caused Dinah's injuries but did not provide any meaningful description of how.

Whited called an expert witness, Dr. Joseph Scheller, who testified that while Dinah's injuries could have been a result of a violent attack or violent shaking, there were other possibilities. He testified that her brain injury could have been caused by a stroke, by a bleeding problem, or by being accidentally dropped. He also testified that Dinah's previous fractures could have been caused from an accidental fall, a child jumping on her, or a dog jumping on her.

2. Whited contends that the trial court plainly erred by instructing the jury that a single witness's testimony is sufficient to establish a fact without also instructing that an accomplice's

testimony must be corroborated. He argues that the accomplice-corroboration charge was required in this case because the State relied on Jamie's testimony, who Whited contends was his accomplice. Pretermitting whether the failure to charge was error, we conclude that Whited's claim fails because he does not meet the applicable standard for showing plain error.

Under Georgia law, "[t]he testimony of a single witness is generally sufficient to establish a fact." OCGA § 24-14-8. However, in "felony cases where the only witness is an accomplice, the testimony of a single witness shall not be sufficient. Nevertheless, corroborating circumstances may dispense with the necessity for the testimony of a second witness." Id. Thus, as we have held, "a felony conviction cannot be sustained solely by the uncorroborated testimony of an accomplice." (Citation and punctuation omitted.) *McKibbins v. State*, 293 Ga. 843, 846 (1) (750 SE2d 314) (2013).

Here, the trial court charged the jury that a single witness's testimony is sufficient to establish a fact and that "[g]enerally there is no legal requirement of corroboration of a witness," but did not

charge that accomplice testimony requires corroboration. Whited contends this was error but concedes that "because he did not request this instruction and failed to object to its omission, his claim of error is reviewed only for plain error." *Pindling v. State*, 311 Ga. 232, 235 (2) (857 SE2d 474) (2021). See also OCGA § 17-8-58 (b) ("Failure to object . . . shall preclude appellate review of such portion of the jury charge, unless such portion of the jury charge constitutes plain error which affects substantial rights of the parties."). To establish plain error, Whited must meet each of the following four prongs:

> (1) the failure to give the instruction was not affirmatively waived, (2) the failure was an obvious error beyond reasonable dispute, (3) the error likely affected the outcome of the proceedings, and (4) the error seriously affected the fairness, integrity, or public reputation of judicial proceedings.

*Pindling*, 311 Ga. at 235 (2). We do "not have to analyze all elements of the plain-error test where an appellant fails to establish one of them." *Payne v. State*, 314 Ga. 322, 325 (1) (877 SE2d 202) (2022). "Satisfying all four prongs of this standard is difficult, as it should

11

be." (Citation and punctuation omitted.) *Hood v. State*, 303 Ga. 420, 426 (2) (a) (811 SE2d 392) (2018).

Pretermitting the question of whether the record supports Whited's assertion that Jamie was acting as his accomplice (and therefore whether the failure to charge on accomplice corroboration was a clear or obvious error[4]), we conclude that this enumeration fails because Whited has not demonstrated that the claimed error likely affected the outcome of the proceedings. Whited argues that Jamie's testimony was the "bedrock" of the State's case because she was the only testifying witness to place Whited in the bedroom with

---

[4] Under OCGA § 24-14-8,

> if there is evidence that could support a finding that a witness was an accomplice to the crime, and that witness provides testimony that directly links the defendant to the crime, it is a clear and obvious error for the trial court to instruct the jury that the testimony of a single witness is sufficient to establish a fact without also instructing the jury that an accomplice's testimony must be corroborated.

*Pindling*, 311 Ga. at 236 (2). But a failure to charge on accomplice corroboration cannot be clear or obvious error if there is not at least slight evidence in the record that the witness was an accomplice. See *Horton v. State*, 310 Ga. 310, 324 (3) (c) (849 SE2d 382) (2020) (concluding that the appellant could not "show[ ] that any error was obvious beyond reasonable dispute" because he "pointed to no law clearly demonstrating that [the witness could] be considered an accomplice").

Dinah when her crying stopped. A review of Jamie's testimony does reveal that Jamie placed Whited with Dinah at the time her crying stopped and immediately prior to the discovery of her breathing problems. Indeed, that is the primary evidence she provided that directly incriminated Whited in the injuries resulting in Dinah's death. But Jamie's testimony on that point can hardly be characterized as more valuable to the State than Whited's statements in his interview with the police that said precisely the same thing. The jury heard a recording of Whited's interview given at the hospital in which he stated that just before Dinah stopped crying and had trouble breathing, he was alone in the bedroom with her while Jamie went to make her a bottle. We cannot see how a rational trier of fact who had been instructed that, to the extent they found Jamie to be an accomplice, they must find her testimony to have been corroborated would have reached any different result under the circumstances described above. In other words, an accomplice-corroboration charge is not likely to affect a jury's verdict where evidence from the defendant's own lips in fact corroborated

13

the potential accomplice testimony in question. Compare *Jackson v. State*, 314 Ga. 751, 755-756 (1) (879 SE2d 410) (2022) (concluding that the failure to provide an accomplice-corroboration charge did not likely affect the outcome of the proceeding where in addition to other witnesses corroborating his involvement, the appellant admitted at trial that he physically accompanied his co-defendants to help obtain a gun but denied that he knew of any plan or intent to shoot anyone); *Hawkins v. State*, 304 Ga. 299, 303 (3) (818 SE2d 513) (2018) (concluding that the trial court did not commit plain error in failing to instruct the jury on accomplice corroboration because there was "significant and consistent evidence outside of the testimony provided by the accomplice to specifically connect [the appellant] to [the] murder . . . including [the appellant's] own admission"); and *Hamm v. State*, 294 Ga. 791, 797 (2) (756 SE2d 507) (2014) (concluding that the failure to charge on accomplice corroboration was harmless because the State introduced independent evidence connecting him to the shooting and introduced the appellant's admission to another person that he

14

killed someone) with *Stanbury v. State*, 299 Ga. 125, 131 (2) (786 SE2d 672) (2016) (concluding that trial court's failure to charge on accomplice corroboration "likely affected" the outcome of the proceedings even though there was slight evidence of corroboration because the accomplice "was the only witness who affirmatively identified" the appellant as the shooter). Due to Whited's own corroboration of the key points of Jamie's testimony and the other physical evidence regarding the nature and extent of Dinah's injuries, it is not likely that giving an accomplice-corroboration charge would have affected the outcome of his trial. Accordingly, Whited has failed to demonstrate plain error.

3. Whited also contends that the trial court abused its discretion by denying his motion in limine under OCGA § 24-4-403 ("Rule 403") to exclude from evidence a recording of a phone call Whited made while in jail in which he discussed the decision to remove his daughter from life support. During the phone call, Whited expressed concerns that removing Dinah from life support could affect his sentence. He noted that if he did not "pull the plug"

on Dinah, he could "just do five years instead of a whole life" in prison. He also stated that he had "another kid out here"; that he had "a life too"; that "two lives aren't worth one"; and that he didn't "want to [pull the plug] and lose [his] life at the same time." Whited also stated multiple times during the call that he did not harm his daughter and that he loved her. The State argued that the call was relevant to Whited's "frame of mind [ ] involving the situation with his daughter." Whited contends that the trial court's denial of his motion was an abuse of discretion. We disagree.

OCGA § 24-4-401 ("Rule 401") provides that "'relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." "The test for relevance under Rule 401 is generally a liberal one." *Booth v. State,* 301 Ga. 678, 683 (3) (804 SE2d 104) (2017). Moreover, "[a]ll relevant evidence shall be admissible, except as limited by constitutional requirements or as otherwise provided by law or by other rules." OCGA § 24-4-402.

16

In addition, OCGA § 24-4-403 provides that "[r]elevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." "[T]he exclusion of evidence under Rule 403 is an extraordinary remedy which should be used only sparingly," and a trial court's decision to admit evidence under Rule 403 will be overturned only for an abuse of discretion. (Citation and punctuation omitted.) *Flowers v. State*, 307 Ga. 618, 622-623 (2) (837 SE2d 824) (2020). See also *Moss v. State*, 298 Ga. 613, 618 (5) (b) (783 SE2d 652) (2016) ("[T]he trial court ha[s] considerable discretion in determining whether the potential prejudice substantially outweigh[s] any probative value.").

Here, while the considerations appear more challenging than most Rule 403 balancing efforts, we conclude that the trial court did not abuse its discretion in determining that the jail call's probative value was not substantially outweighed by its prejudicial effect. Whited's own statements during the jail call concerning the effect Dinah's death would have on his potential sentence could be understood by a jury as indicating callousness or indifference with

17

respect to the well-being of his daughter, the victim of his alleged crimes. Moreover, any perceived disregard for his daughter's well-being was relevant to the question of Whited's intent toward Dinah on the day she sustained her fatal injuries. In light of the fact that the State was pursuing a conviction for malice murder, the contents of the call were relevant to the jury's consideration of intent. Evidence of Whited's valuation of Dinah's life in the weeks following her injuries was relevant to a consideration of his intent with respect to his actions on the day Dinah's fatal injuries were sustained. Additionally, Whited's callousness toward Dinah could have refuted any suggestion that Dinah's injuries were caused by accident. Accordingly, his statements were both relevant to and probative of whether Whited was responsible for Dinah's injuries. See *Smith v. State,* 302 Ga. 717, 724 (3) (808 SE2d 661) (2017) (concluding that the trial court did not abuse its discretion by admitting the appellant's jail call in which he denied any involvement in the crime despite a Rule 403 objection due to the appellant making several derogatory references during the call).

Whited maintains that the jury hearing his consideration of the impact on himself, and specifically of the criminal charges he would face flowing from the decision to terminate life support for Dinah, was unfairly prejudicial in that it invited the jury to convict on that basis rather than based on proof of the charged offenses. While Whited's discussion of his self-interest in the decision to remove Dinah from life support also carried a risk of unfair prejudice, the magnitude of the prejudicial effect of the recorded call is rightfully considered in light of Whited's repeated statements that he never caused Dinah any harm and that he loved his daughter, which the jury also heard. Cf. *Parks v. State*, 300 Ga. 303, 309 (4) (794 SE2d 623) (2016) (noting that the trial court limiting the appellant's impeachment of a witness did not affect his substantial rights because "some of the [witness's] testimony was beneficial to the defense").

Additionally, it is noteworthy in considering the extent of any unfair prejudice that the State's opening and closing statements did not focus on the jail call. See *Morrell v. State*, 313 Ga. 247, 262 (2)

(c) (869 SE2d 447) (2022) (noting that evidence of the appellant's involvement in a prior murder was "prejudicial but not extremely so" in part because "although the State mentioned the [prior] murder in closing arguments, it focused" on the appellant's attempt to cover up his crimes and hinder the State's case); *Morgan v. State*, 307 Ga. 889, 898 (3) (e) (838 SE2d 878) (2020) (noting, while determining that the trial court's improper admission of a video recording was harmless error, that the video recording containing unfair prejudice "played a minor role in both the State's case and [the appellant's] theory of defense"). Instead, the State did not mention the jail call at all during its opening statement and made only one brief reference to the call during the State's closing statement.

Therefore, while admission of the call carried some risk of unfair prejudice, especially in light of the significant deference this Court affords to a trial court's admission or exclusion of evidence under Rule 403, we conclude that the trial court did not abuse its discretion by determining that any unfair prejudice from the

admission of the jail call did not substantially outweigh its probative value. See *Wilson v. State*, 312 Ga. 174, 190 (2) (860 SE2d 485) (2021) ("We recognize that Rule 403 is an extraordinary remedy, and that in reviewing the admission of evidence under Rule 403, we look at the evidence in a light most favorable to its admission, maximizing its probative value and minimizing its undue prejudicial impact." (citation and punctuation omitted)); *Flowers*, 307 Ga. at 622-623 (2) ("The application of the Rule 403 test is a matter committed principally to the discretion of the trial courts." (citation and punctuation omitted)); *Smith*, 302 Ga. at 724 (3) (concluding that the trial court did not abuse its discretion in admitting the defendant's jail call, despite some risk of unfair prejudice, where the probative value of the defendant's own statements could not "be disputed" (citation and punctuation omitted)). Accordingly, the trial court did not abuse its discretion by admitting the recording of the jail call into evidence.

*Judgment affirmed. All the Justices concur.*

Decided January 18, 2023 — Reconsideration dismissed February 21, 2023.

Murder. Walton Superior Court. Before Judge Foster.

*Barbara Mattes*, for appellant.

*Randal M. McGinley, District Attorney, W. Cliff Howard, Assistant District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Matthew B. Crowder, Assistant Attorney General*, for appellee.